OPINION OF THE COURT
Edward J. Greenfield, J.
This is a case involving prelates of a church, arising out of a charge by plaintiff that one of them, using the charisma of Rasputin and the mesmerizing power of a Svengali, had seduced her as a young parishioner and held her in thrall for several years, and that when she broke free, was coerced into silence by the church hierarchy. There are countercharges that plaintiff is fantasizing, that what she claims never took *496 place, and that by publicizing her charges she has defamed the Bishop accused, subjecting him to ridicule and contempt, deprivation of benefice, and loss of emoluments.
Legally, the case implicates, among others, questions of service, pleadings, applicable Statutes of Limitations, equitable estoppel, and whether matters of church governance are immunized from court inquiry by the freedom of religion provisions of the First Amendment.
The complaint, served in November 1988, which the defendants now move to dismiss, as amplified by the affidavits and the exhibits annexed, alleges in essence that in 1977, when defendant Anthimos Draconakis was Bishop of the Pittsburgh diocese of the Greek Orthodox church, he met the then 17-year-old plaintiff, Despina Gallas, the daughter of an Orthodox priest. (The Greek Orthodox church permits priests to marry, but only before ordination.) Ms. Gallas charges the Bishop engaged in a course of conduct to seduce her; and began to make sexual advances despite his vow of celibacy. When he became Bishop of Boston in 1979, she alleges he preyed on her naivete and they continued a sexual affair which lasted until 1982. She claimed she had been held in a state of "sexual servitude” by the Bishop. He favored her father with a post as his chancellor in Boston, and gave her mother a secretarial position in the Bishop’s office. The affair broke up in July 1982 when the Bishop allegedly threatened Ms. Gallas with a gun. Finally she told her parents, who were naturally outraged. They notified the archdiocese, and the Archbishop, after convening a synod of American bishops, in 1983 ordered Bishop Draconakis to take a six-month leave of absence. Thereafter he was reassigned as Bishop of Denver.
Plaintiff sought psychiatric treatment claiming she had become anorexic, and the Archdiocese undertook to pay for her initial medical expenses. In September 1983, the Archbishop notified plaintiff that the payment for further psychiatric and medical treatment would cease. This, she now alleges, was a repudiation of the implied contract to compensate her for her injury and damages. She alleges further that the Archdiocese is vicariously liable for putting Bishop Draconakis in a position to engage in sexual abuse, and that defendants are liable for prima facie tort, the intentional infliction of emotional harm, and for assault, for which plaintiff seeks damages of $20,000,000.
The defendants interposed an answer denying plaintiff’s *497 allegations, claiming the medical payments were made as part of a practice of providing charitable relief for the families of priests, and that plaintiff’s claims are barred by the Statute of Limitations. Defendant Draconakis counterclaims for $20,000,000, charging he was libeled by plaintiff who made her charges of seduction and sexual abuse in the September 28, 1987 issue of People magazine, in the Greek language magazine Epikaira on October 8, 1987, and on television on the Sally Jesse Raphael show, the Phil Donohue show, and the Larry King show. The charges also appeared in Greek language newspapers, and were repeated to the Archbishop.
The Greek Orthodox Archdiocese and the Archbishop claim that service was improper and have moved to dismiss the complaint under CPLR 3211 (a) (5), (7) and (8). They contend the causes of action in the complaint are barred by the Statute of Limitations, that they are insufficient as a matter of law, and the imposition of liability on the Archdiocese with respect to the application of church discipline is violative of the freedom of religion provisions of the First Amendment of the United States Constitution.
Bishop Draconakis has likewise moved for an order dismissing the complaint. Plaintiff cross-moved against defendant Draconakis, pursuant to CPLR 3211 (a) (5) to dismiss the counterclaims.
By previous notice of this court to all parties, that part of the motion to dismiss with respect to the first cause of action alleging breach of contract by the Archibishop and Archdiocese has been converted to a motion for summary judgment pursuant to CPLR 3212. All motions are consolidated for disposition.
THE JURISDICTIONAL ISSUES
Archbishop Iakovos and the Archdiocese seek dismissal of the complaint pursuant to CPLR 3211 (a) (8) for failure to obtain personal jurisdiction. With respect to Archbishop Iakovos, there is no dispute that service was made pursuant to CPLR 302 (2) which authorizes service by delivery "to a person of suitable age and discretion” and mailing to defendant’s "last known residence”. The objections to such service and the alleged failure to file timely proof of service are without merit.
The Archdiocese was served pursuant to CPLR 311— service upon a corporation. It is argued that the summons and *498 complaint were left with a receptionist, who is not a person authorized to receive process either by the Archdiocese or by the statute. The process server states in her affidavit that she told the receptionist at the headquarters of the Greek Orthodox Church that she wished to speak with either the Archbishop or his administrative assistant about service of a summons and complaint. After being informed that the Archbishop was unavailable, the administrative assistant "instructed her to leave the documents with the receptionist.” These facts clearly fall within the scope of Fashion Page v Zurich Ins. Co. (50 NY2d 265 [1980]). As in Fashion Page, here the process server announced her purpose, asked to speak with someone who could either accept service or direct her to the appropriate person and complied with the directions of one who apparently was invested " 'with general powers involving the exercise of judgment’ ”. (Fashion Page v Zurich Ins. Co., supra, at 271.) In sum, the process server was entitled to the cooperation of the employees of the Archdiocese and was diligent in complying with the statute, and therefore service was valid and jurisdiction obtained.
FIRST AMENDMENT CLAIM OF RELIGIOUS IMMUNITY
Much of what is involved in this case involves matters of church affairs — its internal procedures, its handling of complaints against clergymen, its transfer of Bishops and priests, and its requiring a priest to take a vow of silence. Defendants assert that in matters of theological controversy, church discipline, ecclesiastical government, or the standards required of church adherents, the First Amendment of the United States Constitution prohibits any government interference with the free exercise of religion, and hence civil courts may exercise no jurisdiction with respect to such matters. (Serbian Orthodox Diocese v Milivojevich, 426 US 696; Paul v Watchtower Bible & Tract Socy., 819 F2d 875.) "All matters arising out of ecclesiastical or spiritual relations in the administration of the affairs of a religious body should be determined by the superior ecclesiastical tribunal * * * [T]he civil courts of this State * * * should not concern themselves with conflicting contentions relating to doctrinal practice or the merits of a claim that discipline be imposed for alleged violations of duties owed to a religious group by any of its members * * * Absent fraud, collusion or arbitrariness, secular courts have no jurisdiction unless civil or property rights are involved”. (Arneson v General Synod of Refm. Church, 44 AD2d 648.)
*499 Nevertheless, there is no constitutional immunity arising from the issues raised in this case. Even if Father Gallas as a priest were bound by those strictures on him imposed by the church, that prohibition would not bar plaintiff, a layperson. This court has had no hesitancy in dealing with matters involving church real estate or other secular matters. (Rector, Wardens & Members of Vestry of St. Bartholomew’s Church v City of New York, 914 F2d 348, 353, cert denied sub nom. Committee to Oppose Sale of St. Bartholomew’s Church v Rector, Wardens & Members of Vestry of St. Bartholomew’s Church, — US —, 111 S Ct 1103.) "The critical distinction is * * * between a neutral, generally applicable law that happens to bear on religiously motivated action, and a regulation that restricts certain conduct because it is religiously oriented”. (914 F2d, at 354; Employment Div., Ore. Dept. of Human Resources v Smith, 494 US 872, 879; Matter of Abrams v Temple of Lost Sheep, 148 Misc 2d 825, 829; Holy Spirit Assn. for Unification of World Christianity v Harper & Row, Publishers, 101 Misc 2d 30, 35.) Certainly, where clergy members are charged with intentional torts, liability may be imposed. (See, Alexander v Unification Church, 634 F2d 673; Meroni v Holy Spirit Assn., 119 AD2d 200.) While "it is well established that freedom of religious belief is absolute, freedom to act, even in the name of religion 'remains subject to regulation for the protection of society’ (Cantwell v Connecticut, 310 US 296, 304 * * *). Thus, a church may be held liable for intentional tortious conduct on behalf of its officers or members, even if that conduct is carried out as part of the church’s religious practices”. (119 AD2d, at 202-203.)
Unfortunately, it is not unknown that cases arise of clergy misbehavior involving egregious abuse of a position of trust and confidence to seduce a female member of the congregation. (See, e.g., Handley v Richards, 518 So 2d 682 [Ala]; Anclote Manor Found, v Wilkinson, 263 So 2d 256 [Fla]; Horak v Biris, 130 Ill App 3d 140, 474 NE2d 13; Hester v Barnett, 723 SW2d 544 [Mo]; Mazza v Huffaker, 61 NC App 170, 300 SE2d 833; Radecki v Schuckardt, 50 Ohio App 2d 92, 361 NE2d 543; Lund v Caple, 100 Wash 2d 739, 675 P2d 226.) Obviously, not all conduct by a clergyman is religiously motivated. Plaintiffs claims against the Bishop for intentional misconduct, and against the Archbishop and the church for condoning such conduct and for alleged coercion and duress in an attempted "cover-up” are not exempt from secular inquiry by the courts. *500 There being no religious immunity, further examination of the complaint and defenses is required.
THE STATUTE OF LIMITATIONS DEFENSE
Whatever the merits of plaintiffs causes of action for negligence, prima facie tort, intentional infliction of emotional stress, and assault and battery, the allegations of which are emphatically denied, plaintiff is confronted with the problem of the Statute of Limitations. The intentional torts are subject to a one-year limitation. (CPLR 215; Gallagher v Directors Guild, 144 AD2d 261.) The cause of action alleging negligent hiring and retention of an employee is subject to the three-year limitation of CPLR 214.
Plaintiffs affair with Bishop Draconakis had ended, she said, on July 10, 1982 when he allegedly threatened her and held a gun to her head. The Bishop’s version of the events is quite different — that plaintiff was a neurotic and lovesick girl with a "crush” who persisted in misunderstanding his fatherly advice, and tried to force herself on him. When he rejected her advances she threatened "I’ll fix you”, and created the story about a gun to the head out of whole cloth. On July 29, 1982, plaintiffs father wrote asking to be reassigned because of "burnout”, saying nothing about his daughter. On the same day (almost three weeks after the alleged gun incident), plaintiff wrote to the Bishop:
"With great sadness & emptiness in my heart I’m writing you this letter. I can’t bear the thought of moving away, and not being near you. I’m praying my father will reconsider his resignation * * * They don’t know the great love that I have for you. These past few years with you have meant so much to me. Sometimes I wonder if you really know how I love you, and how much your love really means to me. I will never love another man the way I love you. My heart belongs to you. You’re the very special man in my life and I’ll always love you. My prayer to God is that he’ll keep you well and watch over you & protect you * * *
"All my love,
"Despi
"XOXOXO”.
Whatever the truth about these conflicting charges, whether it be sexual dominance by the Bishop or unrequited passion by a spurned young parishioner seeking vengeance, it is clear that these charges of events five to six years before the service of the summons and complaint would ordinarily be barred by *501 the Statute of Limitations. The fact that the acts giving rise to the cause of action arose outside the State (in Massachusetts where the Statute of Limitations is three years) does not serve to extend the one-year time under CPLR 202, which requires application of whichever limitations period is shorter. (De-Weerth v Baldinger, 836 F2d 103 [2d Cir], cert denied 486 US 1056.)
ESTOPPEL OF LIMITATIONS DEFENSE
Plaintiff argues that it would be inequitable to apply the Statute of Limitations in her case, because she contends that the church lured her through promises and coercion to forego bringing any action, and to cloak the entire affair with a veil of silence to avoid embarrassment. She and her father assert that they brought their complaint about Bishop Draconakis to the attention of Archbishop Iakovos in New York in July 1982, and the Archbishop wanted the incident kept quiet. They say it was contemplated that a new position would be created for Father Gallas, and the church would take care of the medical expenses incurred on plaintiff’s behalf. Nevertheless, plaintiff filed formal charges with the Archdiocese in October 1982. The Archdiocese convened a synod of 10 Bishops to investigate the charges. The synod, while finding the evidence did not warrant prosecution of charges, ordered a six-month leave of absence for Bishop Draconakis, and then a reassignment. This was affirmed by the Patriarch of the church in Athens. Despite the outrage of plaintiff and her father, it is asserted that the agreement by the Archbishop to pay for plaintiff’s therapy and medical expenses caused plaintiff to exercise forbearance in commencing a lawsuit and making public disclosure. Plaintiff alleges that even after the payments to her were terminated in September 1983, she was inhibited from litigation because of the threat that her father’s position with the church would be terminated. In fact, he was terminated in 1985 and took a job "flipping burgers” at a MacDonald’s on the Connecticut Turnpike until assigned to a parish in New Jersey. In October 1985, the Archdiocese promulgated a prohibition against litigation. Nevertheless, plaintiff and her father went public with the matter, and their revelations were the basis for an article in People magazine in September 1987, detailing the charges of "seduction by a prince of the church”. Interviews on television talk shows followed. Father Gallas was summoned to Istanbul, before a special synod presided over by the Patriarch, where in 1987 he *502 claims he was coerced into signing a document acknowledging the "senseless actions” of his daughter and himself, and the harm they had brought on the church through disclosure to the media. He promised under oath that neither he nor any member of his family would pursue the matter in civil courts or by any other legal means.
While plaintiff’s allegations of her ordeal and of the threats, pressure, and promises to persuade her to forbear from litigation may strike a sympathetic chord and appear to create an issue as to whether duress tolls the Statute of Limitations (cf., Piper v Hoard, 107 NY 67; Pacchiana v Pacchiana, 94 AD2d 721), upon closer analysis of the facts the claims of duress compelling silence and inaction will not withstand scrutiny.
The alleged promise to pay plaintiff’s medical expenses if she remained silent and the accompanying threat to stop was no longer being carried out after September 1983. Plaintiff was free to act then. The law is clear that once the coercion or duress ceases, the plaintiff must act diligently. (Simcuski v Saeli, 44 NY2d 442.) The "gag orders” issued by the church hierarchy with respect to Father Gallas and members of his family were promulgated in October of 1985 and in October 1987. But that came after the Statute of Limitations applicable to plaintiff’s tort claims had expired. Once a cause of action has become time barred, it cannot be revived and given new life because of subsequent duress. (Pahlavi v Palandjian, 809 F2d 938, 942.) It is to be noted that despite the alleged persistent coercion and duress, plaintiff had no hesitancy in going public with the affair and making disclosure to national media in 1987. The alleged coercive session in Istanbul with Father Gallas came after the cat was out of the bag.
General allegations of threats, coercion and duress are not enough to toll the Statute of Limitations. Even alleged threats of physical violence and loss of employment have been deemed insufficient to estop a defendant from interposing a defense of Statute of Limitations. (Stadtman v Cambere, 73 AD2d 501.) Here the threat of loss of employment was not against plaintiff, but against her father. The " 'statute begins to run irrespective of * * * whether [the injured party] has enough of courage and independence to resist a hostile influence, and assert his rights or not.’ ” (Baratta v Kozlowski, 94 AD2d 454, 459, citing Piper v Hoard, 107 NY2d 67, 71, supra.)
In 1985, Father Gallas had not been intimidated into silence, but was continuously charging that his daughter had *503 been the victim of perversity, betrayal and dishonesty. He complained that he was without position and without salary. In June 1985, he wrote to the Archbishop, "In retrospect, I very deeply regret that I did not act immediately to press charges and pursue this in the civil courts * * * Yes, you helped us with financial assistance * * * and for this we are truly grateful, but do not think for one moment that morality, truth and justice are going to be compromised because of the financial assistance given.”
He persisted in asking the Archdiocese for an assignment. In July 1985, he wrote: "What is the real reason that I am not being assigned? Am I being deserted because of the scandal caused by that Satan in Denver and the stigma that he placed on Despi and all of us? If such is the case, let it be known that my story will be known from coast to coast for I have engaged legal counsel and I will pursue my rights in the courts if I have to.” This is not the language of one who was intimidated into silence for fear of his job. Nevertheless, despite his bold pronouncements, three more years were to elapse before legal action was actually commenced.
The two salient reasons given by plaintiff for her silence were (1) her fear that her father would lose his position with the church and (2) that by speaking out she would lose the benefit of the January 1983 agreement with the Archdiocese for the payment of her medical expenses. However, by September 1983 the Archbishop had notified her father that no more medical bills would be paid. By July 8, 1985, her father had been without a salary for three months and had turned down an offer of a parish which he felt would not provide an adequate income, and he was working for MacDonald’s. Therefore, by July 1985 both of plaintiff’s worst fears had been realized, and she should have acted. There is no justification for not having commenced the action until November 1988, and the Statute of Limitations stands as a bar to torts alleged to have been committed from 1978 to 1983.
CONTRACT CLAIM FOR MEDICAL PAYMENTS
The Statute of Limitations would not serve to bar a contract claim, since the action was commenced within less than six years of the alleged contract and breach. Even if plaintiff’s first cause of action for breach of an alleged contract to pay all of plaintiff’s medical bills in return for her silence is not to be construed as a tort claim in another guise (Baratta v *504 Kozlowski, 94 AD2d 454, 461, supra; Sears, Roebuck & Co. v Enco Assocs., 43 NY2d 389; cf., Davis v St. Joseph’s Children’s Servs., 99 AD2d 960, affd 64 NY2d 794), on the alleged facts as set forth in the pleadings and affidavits, there is no enforceable contract.
The essence of plaintiff’s contract claim as alleged in paragraph 18 of the complaint is that "In or about January, 1983, defendants Greek Orthodox Archdiocese and Archbishop Iakovos began paying medical expenses of plaintiff as compensation for damage sustained as a result of defendant Anthimos Draconakis’ wrongful conduct, and by their promise and conduct, induced plaintiff to believe that such defendants had agreed to compensate her for all her injury and damage.” Defendants raise several issues with respect to the purported contract, i.e., that the terms are vague and indefinite, that any action undertaken by the Archdiocese was gratuitous, and that the alleged contract does not meet the requirements of the Statute of Frauds. More importantly, plaintiff neither alleges nor demonstrates in subsequent affidavits that there was mutual assent. Plaintiff alleges that because her initial medical expenses were paid for by the Archdiocese, they "induced plaintiff to believe that such defendants had agreed to compensate her for all her injury and damage.” There is, of course, a world of difference between an agreement with manifestations of assent on both sides and a unilateral belief by one party that the other had implicitly agreed.
The promise she alleges "to compensate her for all her injury and damage” is without limitation as to time, extent or amount. (Cf., Saunder v Baryshnikov, 110 AD2d 511 [alleged defendant would take care of plaintiff’s financial needs for the rest of her life]; Trimmer v Van Bomel, 107 Misc 2d 201 [to provide plaintiff with a standard of sumptuous living for the remainder of his life].)
Defendants also contend that the alleged implied contract lacked consideration, but was at best a limited gratuitous undertaking. Plaintiff alleges that her part of the contract was to exercise forbearance from litigation. Whatever validity these contentions may have, it is the absence of any agreement which causes the contract action to fall.
The payment of relatively small sums to help the plaintiff cannot, without more, be enlarged into an undertaking to cover her very substantial medical expenses for anorexia and for psychiatric treatment as well as for her college education, *505 extending indefinitely. The making of some payments cannot be construed as an implicit promise to keep making them indefinitely.
When the payments were discontinued, Father Gallas complained bitterly, but he did not then claim that there was a promise or commitment which had been reneged on. To the contrary, in a letter to the Archbishop on October 12, 1983, he made the explicit statement: "I do not expect the Archdiocese to pay my obligations and bills which have arisen and may still arise as a result of that man’s misconduct and immorality.”
In any event, there is no personal liability on the part of the Archbishop merely because he was present at the formation of the alleged contract. He clearly was acting in a representative capacity on behalf of the Archdiocese and there is nothing to indicate that he was accepting personal responsibility for the obligations of the church. (Salzman Sign Co. v Beck, 10 NY2d 63.)
It is clear that plaintiff and her father suffered anguish and frustration. It is equally clear that no cause of action will arise at law for disappointment and frustrated expectations. The facts, as buttressed by the affidavits and correspondence, make it plain that plaintiff and her father were looking to the beneficence of the church for help, and that there was no existing and ongoing commitment.
CROSS MOTION TO DISMISS COUNTERCLAIMS
Bishop Draconakis has counterclaimed against plaintiff, contending that he has been viciously libeled. Plaintiff has cross-moved to dismiss his counterclaims as time barred. The counterclaim alleges that in the fall of 1987, after the article in People magazine was published, plaintiff appeared at various television talk shows and repeated the substance of her allegations against Bishop Draconakis. The last such libelous statement is alleged to have been published on November 28, 1987. An action for libel or slander must be commenced within one year. (CPLR 215 [3].) The complaint was served on Draconakis in December of 1988 and his counterclaim was not promulgated and served until after December 20.
CPLR 203 (c) specifies that a counterclaim would not be barred if it was not barred at the time the claims asserted in the complaint were interposed. However, the one-year period for bringing a libel claim had expired before the service of *506 plaintiff’s complaint. The libel in 1987 was a different set of events then what plaintiff charged happened before 1983. Furthermore, in the light of the court’s rulings dismissing the complaint, the counterclaims cannot now stand alone as a basis for recovery. They have no independent viability. (See, Weinstein-Korn-Miller, CPLR Manual § 2.11, at 2-25.)
For the reasons above stated, the motions to dismiss each cause of action alleged in the complaint are granted, as is plaintiff’s motion to dismiss the counterclaims.