718 So.2d 286 (1998)
Jane DOE, Appellant,
v.
William Dunbar EVANS, III; Church of the Holy Redeemer, Inc.; The Diocese Of Southeast Florida, Inc.; and Calvin O. Schofield, Jr., Appellees.
No. 97-0879.
District Court of Appeal of Florida, Fourth District.
September 9, 1998.
Certification Denied October 29, 1998.
*287 Edward Campbell of Roberts & Sojka, P.A., and Randy D. Ellison, West Palm Beach, for appellant.
Thomas E. Ice of Barwick, Dillian, Lambert & Ice, P.A., Miami, and Christopher Renzulli of Renzulli & Rutherford, New York City, for appellees Church of the Holy Redeemer, Inc., The Diocese of Southeast Florida, Inc., and Calvin O. Schofield, Jr.
POLEN, Judge.
Jane Doe, a former parishioner at the Church of the Holy Redeemer (Holy Redeemer), appeals the dismissal of her second amended complaint as against Holy Redeemer, the Diocese of Southeast Florida, Inc., (the Diocese), and Bishop Calvin O. Schofield, Jr. (Schofield) (collectively "church defendants"). Another defendant, Reverend William Dunbar Evans, III, did not join in the church defendants' motion to dismiss, and Doe's claims against Evans remain pending in the lower court. We have before us only the dismissal of Does' claims against the church defendants. We affirm the trial court's dismissal of those claims.

FACTS
In Doe's second amended complaint against the several defendants, Doe alleged she was a former parishioner at Holy Redeemer where Evans was employed as a pastor responsible for providing counseling and spiritual advice to parishioners having marital difficulties. Doe alleged Evans approached her and asked to assist her with counseling, spawning a pastoral counselor-counselee relationship that endured from December 27, 1991, to February of 1992.
Doe alleged the Diocese, Schofield, and Holy Redeemer were aware of prior incidents involving sexual misconduct during counseling by Evans at another church, within the Diocese, and at Holy Redeemer. Despite this knowledge, nothing was done to rectify the situation. Doe alleged Schofield and the Diocese had control over hiring, firing, compensation, and discipline of priests including Evans.
Doe alleged a cause of action for breach of fiduciary duty against all defendants, asserting Evans breached the duty owed to Doe by becoming romantically involved with her in a manner that made it impossible for Evans to adequately keep Doe's interests paramount. Doe alleged Holy Redeemer, Schofield, and the Diocese were made aware early in the counseling process that Evans was abusing his position of trust. She asserted Evan's alleged conduct was not motivated by any sincerely held religious belief, further alleging the church defendants owed her a fiduciary duty, (apparently premised on Doe having informed the church defendants of Evan's conduct), which the church defendants breached, causing Doe embarrassment, guilt, and ridicule.
Additionally, Doe alleged a cause of action against Holy Redeemer, the Diocese, and Schofield for negligent hiring and/or supervision and/or retention, as well as a cause of action against all defendants for "outrage."
The church defendants moved to dismiss Doe's second amended complaint on the basis the causes of action brought against these church defendants involved practices and procedures beyond the purview of secular courts. They argued the adjudication of these claims would result in the court's excessive entanglement with religious beliefs contrary to the First Amendment of the United States Constitution. The church defendants argued the claim of breach of fiduciary duty was essentially a claim of clergy malpractice, which they alleged had been uniformly rejected by states considering the claim. This claim, they argued, was barred by both the Establishment Clause and the *288 Free Exercise Clause of the First Amendment.
The church defendants also argued the first amendment barred the claim of negligent hiring, supervision, and retention, because those claims required a determination of what makes one competent to serve as a priest, which in turn requires interpretation of church canons and internal policies and practicesdeterminations beyond the court's scope of review.
As to Doe's claim for outrageous conduct, the defendants argued this cause of action was not recognized by Florida courts. Alternatively, the church defendants argued if Doe's claim was read as a claim for intentional infliction of emotional distress, her allegations did not rise to the level of "outrageousness" required by Florida courts. Finally, the church defendants argued the adjudication of this claim was beyond the secular court's scope of review.
The trial court granted the church defendants' motion to dismiss with prejudice stating Doe's claims were barred by the First Amendment.

OVERVIEW OF FIRST AMENDMENT PRINCIPLES
The First Amendment to the United States Constitution provides in pertinent part: "Congress shall made no law respecting an establishment of religion, or prohibiting the free exercise thereof...." This phrase is broken down into two clauses: the first is referred to as the Establishment Clause, and the second as the Free Exercise Clause. "The entanglement doctrine, which prohibits excessive governmental entanglement with religion, springs from the Establishment Clause." L.L.N. v. Clauder, 209 Wis.2d 674, 563 N.W.2d 434, 440 (1997).
An explanation of the excessive entanglement doctrine applicable to the instant First Amendment issue is contained in the court's opinion in Konkle v. Henson, 672 N.E.2d 450 (Ind.Ct.App.1996):
The First Amendment ... contains two freedoms with respect to religion: the freedom to believe and the freedom to act. The freedom to believe is absolute, while the freedom to act is subject to regulation for the protection of society. However, any regulation must meet a three-part test:
First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion; finally, the statute must not foster "an excessive government entanglement with religion."
* * * * * *
Excessive entanglement occurs when the courts begin to review and interpret a church's constitution, laws, and regulations. The First Amendment prohibits courts from resolving doctrinal disputes or determining whether a religious organization acted in accordance with its cannons and bylaws.
Konkle, 672 N.E.2d at 454 (quoting Lemon v. Kurtzman, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971)) (additional citations omitted).
As to excessive governmental entanglement with religion, the court in L.L.N. noted:
It is well-settled that excessive governmental entanglement with religion will occur if a court is required to interpret church law, policies, or practices; therefore, the First Amendment prohibits such an inquiry. However, it is equally well-settled that a court may hear an action if it will involve the consideration of neutral principles of law.
L.L.N., 563 N.W.2d at 440 (citations omitted).
Applying these basic principles to Doe's claims against the church defendants, we must examine whether the determination of her claims necessarily implicates an excessive governmental entanglement with religion. If the court is required to interpret church law, policies, or practices, the First Amendment prohibits such an inquiry. Examination of case law from other jurisdictions reveals a split of authority on this question as to each of Doe's claims.

*289 NEGLIGENT HIRING, RETENTION, AND SUPERVISION
To prevail on claims of negligent hiring, supervision, and retention, the plaintiff must establish the employer owes a duty to the plaintiff, the breach of which is the proximate cause of the plaintiff's injuries. See Watson v. City of Hialeah, 552 So.2d 1146 (Fla. 3d DCA 1989).
Negligent hiring occurs when, prior to the time the employee is actually hired, the employer knew or should have known of the employee's unfitness, and the issue of liability primarily focuses upon the adequacy of the employer's pre-employment investigation into the employee's background. Negligent retention, on the other hand, occurs when, during the course of employment, the employer becomes aware or should have become aware of the problems with an employee that indicated his unfitness, and the employer fails to take further action such as investigating, discharge, or reassignment.
Garcia v. Duffy, 492 So.2d 435, 438-439 (Fla. 2d DCA 1986) (citations omitted).
Doe contends Doe v. Dorsey, 683 So.2d 614 (Fla. 5th DCA 1996), rev. denied, 695 So.2d 699 (Fla.1997) controls and holds civil damages may be assessed against a church for proven claims of negligent hiring, supervision, and retention. We disagree, and believe Dorsey actually supports affirmance.
In Dorsey, a former altar boy alleged a priest exerted undue influence, dominion, and control over the plaintiff to participate in an ongoing sexual relationship beginning when the boy was thirteen and continuing long after the young man reached majority. Id. at 615. The court concluded allegations of abuse occurring while the plaintiff was a minor were time-barred. Id. at 617. In addressing a potential First Amendment bar, the court stated it would limit the circumstances under which it would allow civil liability for negligent retention to criminal conduct:
Although the Academy of Florida Trial Lawyers makes a convincing case that the First Amendment does not protect the church when the acts of the clergy involve children and are criminal in nature, because we hold that the action against the church and the bishop in this case for the negligent retention of the priest, insofar as the abuse of plaintiff which occurred while he was a minor is concerned, is time-barred, the issue of whether the First Amendment protects the church when its clergy commits criminal acts is not before us. In any event, we are persuaded that just as the State may prevent a church from offering human sacrifices, it may protect its children against injuries caused by pedophiles by authorizing civil damages against a church that knowingly (including should know) creates a situation in which such injuries are likely to occur. We recognize that the State's interest must be compelling indeed in order to interfere in the church's selection, training and assignment of its clerics. We would draw the line at criminal conduct.

Id. (emphasis added).
The surviving allegations of the plaintiff's complaint in Dorsey involved neither pedophilia nor illegal adult sexual behavior. Id. As in the instant case, the plaintiff did not contend he did not consent to the relationship. Id. at 617-618. The court concluded it did not believe a sexual battery was committed when a person of normal intelligence submitted to a sexual relationship due to an emotional attachment to another person. Id. at 618. Thus, Dorsey actually supports the church defendants' position here because the plaintiff's allegations of a "sexual relationship" in the instant case fall short of alleging criminal conduct.
The same arguments accepted in Dorsey have been accepted by many courts and rejected by others. Those courts that find no First Amendment bar to claims of negligent hiring, retention, and supervision generally do so in the context of allegations involving sexual assault on a child.[1] As we have noted, *290 the instant case presents a less compelling factual scenario.
We are persuaded by the reasoning expressed in Swanson v. Roman Catholic Bishop of Portland, 692 A.2d 441 (Me.1997), where the court noted the split of authority on this issue and determined to side with those jurisdictions finding a bar to such claims. Id. at 443-444. In Swanson, the court began by recognizing that by dictating neutrality on the part of the courts, "our constitutions ensure that religious organizations remain free from `secular control or manipulation' and retain `power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine.'" Id. at 443 (quoting Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church, 344 U.S. 94, 73 S.Ct. 143, 97 L.Ed. 120 (1952)). The court rejected the plaintiffs' contention their negligent supervision claim could be resolved by the application of neutral tort principles. Id. It reasoned that "[w]hen a civil court undertakes to compare the relationship between a religious institution and its clergy with the agency relationship of the business world, secular duties are necessarily introduced into the ecclesiastical relationship and the risk of constitutional violation is evident." Id. at 444.
The court concluded the question of the existence of an agency relationship would entail examination of church doctrine governing the church's authority over the subject priest, a query barred as necessitating interpretation of ambiguous religious law and usage. Id. Beyond this initial inquiry, imposing liability and secular duties on the church as a "principle" would infringe on the church's right to determine the standards governing the relationship between the church, its bishop, and the parish priest. Id. at 445. The court cited Pritzlaff v. Archdiocese of Milwaukee, 194 Wis.2d 302, 533 N.W.2d 780 (1995), cert. denied, 516 U.S. 1116, 116 S.Ct. 920, 133 L.Ed.2d 849 (1996) (holding torts of negligent hiring, retention, and supervision as against church barred by First Amendment due to problems of excessive entanglement and chilling effect of award of damages, in context of adult sexual relationship), and Schmidt v. Bishop, 779 F.Supp. 321 (S.D.N.Y.1991) (finding time bar to claim for negligent hiring, retention, and supervision, yet stating First Amendment bars such action because pastor of Presbyterian Church is not analogous to common law employee and question of church's supervision involves entanglement in intricate principles of church governance), concluding as did the latter court that any award of damages would have a chilling effect leading indirectly to state control over the future conduct of affairs of a religious denomination. Id. The Swanson court concluded "[p]astoral supervision is an ecclesiastical prerogative," and on the facts before it, imposing a secular duty of supervision on the church, enforced through civil liability, "would restrict the church's freedom to interact with its clergy in the manner deemed proper by ecclesiastical authorities and would not serve a societal interest sufficient to overcome the religious freedoms inhibited." Id.
Along with Swanson, additional case law exists supporting our conclusion Doe's claim of negligent hiring, retention, and supervision is barred by the First Amendment. In Gibson v. Brewer, 952 S.W.2d 239 (Mo.1997), when considering allegations of child sexual abuse, the court held claims against a diocese of negligent hiring, ordination, and retention, necessarily involved interpretation of religious doctrine, policy, and administration. Id. at 246-247. The court concluded judicial inquiry into the hiring, ordaining, and retaining of clergy would result in an endorsement of religion "by approving one model for church hiring, ordination, and retention of clergy." Id. at 247. Quoting Serbian Eastern Orthodox Diocese v. Milivojevich, 426 U.S. 696, 96 S.Ct. 2372, 49 L.Ed.2d 151 (1976), the court concluded "[o]rdination of a priest is a `quintessentially religious' matter, `whose resolution the First Amendment commits exclusively to the highest ecclesiastical tribunals of this hierarchical church.'" Gibson, 952 S.W.2d at 247.
The court similarly concluded a claim for negligent failure to supervise clergy was barred by the First Amendment because it implicated the duty of a master to control conduct of a servant. Id. "Adjudicating the *291 reasonableness of a church's supervision of a clericwhat the church `should know'requires inquiry into religious doctrine." Id. Such an inquiry would create an excessive entanglement, inhibit religion, and result in the endorsement of one model of supervision. Id.
We recognize there also exists authority finding no bar to a claim for negligent hiring, retention, and supervision; however, we note this result most often appears in the context of criminal sexual conduct. See Nutt v. Norwich Roman Catholic Diocese, 921 F.Supp. 66 (D.Conn.1995) (rejecting Seventh Circuit's reasoning in Dausch, supra, in context of sexual abuse perpetrated by priest); Kenneth R. v. Roman Catholic Diocese, 229 A.D.2d 159, 654 N.Y.S.2d 791, cert. denied, ___ U.S. ___, 118 S.Ct. 413, 139 L.Ed.2d 316 (1997) (allowing negligent supervision and retention claims against church defendants where priest accused of pedophilia); Konkle v. Henson, 672 N.E.2d 450 (Ind. Ct.App.1996) (allowing negligent hiring, retention, and supervision claims against church defendants where minister was accused of sexual molestation); Erickson v. Christenson, 99 Or.App. 104, 781 P.2d 383 (1989) (allowing claim for negligent supervision without discussing impact of First Amendment); Gallas v. Greek Orthodox Archdiocese of N & S Am., 154 Misc.2d 494, 587 N.Y.S.2d 82 (Sup.Ct.1991) (holding plaintiff's claims against bishop for intentional misconduct and against Archbishop and church for condoning such conduct and for alleged coercion and duress in attempted "cover-up" are not exempt from secular inquiry by the courts); Jones v. Trane, 153 Misc.2d 822, 591 N.Y.S.2d 927 (Sup.Ct.1992) (allowing negligent hiring and supervision claim in context of sexual abuse against child, relying on opinion in DeStefano v. Grabrian, 763 P.2d 275 (Colo.1988) (allowing claim for negligent supervision in context of adult sexual relationship begun during marriage counseling on basis Free Exercise clause speaks to beliefs, not conduct)); and Mrozka v. Archdiocese of St. Paul & Minneapolis, 482 N.W.2d 806 (Minn.Ct.App.1992) (stating church conceded an examination of the reasonableness of its actions and the bases for its decisions regarding placement and discipline of child molesting priest was constitutionally allowable for purposes of determining negligence and compensatory damages).
Our examination of case law presenting both sides of this question leads us to conclude the reasoning of those courts holding the First Amendment bars a claim for negligent hiring, retention, and supervision is the more compelling. In a church defendant's determination to hire or retain a minister, or in its capacity as supervisor of that minister, a church defendant's conduct is guided by religious doctrine and/or practice. Thus, a court's determination regarding whether the church defendant's conduct was "reasonable" would necessarily entangle the court in issues of the church's religious law, practices, and policies. "Hiring" in a traditional sense does not occur in some religions, where a person is ordained into a particular position in the church, and assigned to one parish or another. A court faced with the task of determining a claim of negligent hiring, retention, and supervision would measure the church defendants' conduct against that of a reasonable employer; a proscribed comparison.

BREACH OF FIDUCIARY DUTY
Initially we reject the church defendants' suggestion Doe's breach of fiduciary duty claim is a disguised "clergy malpractice" claim. Each court to consider the viability of a clergy malpractice claim has concluded the First Amendment bars claims for clergy malpractice because such a claim requires a court to determine "whether the adherent of a particular faith has properly interpreted the tenets of that faith." Dausch v. Rykse, 52 F.3d 1425 (7th Cir.1994) (citing Thomas v. Review Bd. of Indiana Employment Sec. Div., 450 U.S. 707, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981)). Our examination of Doe's complaint reveals she alleged the elements of a breach of fiduciary duty claim, not a clergy malpractice claim.
Doe relies primarily on two cases: F.G. v. MacDonell, 150 N.J. 550, 696 A.2d 697 (1997); and Sanders v. Casa View Baptist Church, 898 F.Supp. 1169 (N.D.Tex.1995) (Sanders I). F.G. is distinguishable as concerning *292 claims brought against an individual priest and not church defendants. Sanders would support Doe's arguments; however, we believe the better reasoned cases hold contrary to the implicit holding in Sanders.
In F.G., a majority of the supreme court of New Jersey concluded a parishioner, F.G., could proceed with her claims for breach of fiduciary duty and negligent infliction of emotional distress against an Episcopal priest who allegedly assumed a counselor/counselee relationship with F.G. and subsequently induced her to engage in an inappropriate sexual relationship. F.G., 696 A.2d at 700. In the context of a claim against the offending priest only (as opposed to other church defendants as is the case here), the court distinguished clergy malpractice from breach of fiduciary duty on the basis the latter did not require definition of the relevant standard of care; a question that embroils courts in establishing the training, skill, and standards applicable for members of the clergy in a diversity of religions with widely varying beliefs. Id. at 703.
Significantly, the court also considered whether F.G. could proceed with a breach of fiduciary duty claim against another priest, Reverend Harper, who allegedly wrote a letter and delivered a sermon to the congregation concerning the offending priest's relationship with F.G. Id. at 700. F.G. alleged Harper breached his fiduciary duty by exploiting her trust and confidence through his mischaracterization of the offending priest's conduct and the nature of her relationship with that priest. Id. at 705. The court noted F.G.'s ability to maintain her action against this second priest depended on whether a court was able to adjudicate F.G.'s claims without becoming entangled in church doctrine, and remanded for determination of that issue. Id.
The dissent in F.G. argued the plaintiff's claims against both priests should be dismissed, asserting the conduct of the offending priest was allegedly tortious because the defendant priest was religious. In other words, had the priest been a neighbor, co-worker, or friend seeking to comfort F.G., no secular law would make his extramarital affair a tort or crime: "no law makes it a tort or crime for consenting adults to engage in sexual relationships." Id. at 706. The dissent concluded that to base a tort action on a breach of religious doctrine constituted an establishment of religion in violation of the First Amendment. Id. at 709.
Doe also relies on Sanders, in which the court considered motions for summary judgment filed in a case where two female plaintiffs alleged they sought marital counseling from a Baptist minister, Shelby Baucum, who subsequently, and simultaneously, began sexual relationships with them. Sanders, 898 F.Supp. at 1173. The court cited Schmidt v. Bishop, 779 F.Supp. 321, 327 (S.D.N.Y.1991) for the proposition "`tort claims for behavior by a cleric that [do] not require the examination of religious doctrine are cognizable.'" Sanders, 898 F.Supp. at 1174. It concluded Baucum's alleged conduct was not subject to First Amendment protection because that conduct was not part of the beliefs and practices of Baucum's church, Casa View Baptist Church (Casa View). Id. at 1175.
The court granted Casa View's motion for summary judgment as to the plaintiffs' claims for breach of fiduciary duty and negligent hiring/retention/supervision on the bases the church conducted a reasonable search before hiring Baucum, and did not know, nor should it have known, that Baucum was counseling the plaintiffs and engaging in a sexual relationship with them. Id. at 1179.
Following the District Court's opinion, Baucum proceeded to trial and the jury returned a verdict in favor of the plaintiffs, which both sides appealed. Sanders v. Casa View Baptist Church, 134 F.3d 331 (5th Cir. 1998) (Sanders II). On appeal, the plaintiffs alleged error in the district court's grant of summary judgment in favor of Casa View. However, the Fifth Circuit approved of the summary judgment based on a failure of proof as to the plaintiffs' respondeat superior and negligent hiring/retention/supervision claims, among others. Id. at 339-340. The court in Sanders II did not address a First Amendment bar to claims brought against the church defendants.
Authority supporting affirmance of the instant order on appeal includes Amato v. *293 Greenquist, 287 Ill.App.3d 921, 223 Ill.Dec. 261, 679 N.E.2d 446 (1997), where the court accepted the reasoning of Dausch v. Rykse, 52 F.3d 1425 (7th Cir.1994) and held a claim for breach of fiduciary duty barred by the First Amendment because in order to determine the duty owed by a church, the court was required to define a reasonable duty standard and to evaluate the cleric's conduct against that standard, an inquiry "of doubtful validity under the Free Exercise Clause." Amato, 223 Ill.Dec. 261, 679 N.E.2d at 454. The court recognized contrary holdings in F.G. and Sanders, yet declined to follow those cases on the basis that when a parishioner lodges a claim of breach of fiduciary duty, religion is not merely incidental to the plaintiff's relationship with a defendant, but is the foundation for the claim. Id. The court noted the plaintiff's "fiduciary relationship is inescapably premised upon the cleric's status as an expert in theological and spiritual matters." Id. However, the court recognized the allegations of plaintiff's complaint made out a claim for intentional infliction of emotional distress because, unlike the circumstances of the instant case, the plaintiff alleged conduct so outrageous as to go beyond all bounds of decency, and to be regarded as atrocious and utterly intolerable in a civil community. Id., 223 Ill.Dec. 261, 679 N.E.2d at 454-455.
L.C. v. R.P., 563 N.W.2d 799 (N.D.1997), also supports affirmance. In the context of an allegation of adult sexual misconduct, the court in L.C. expressly avoided the First Amendment argument on the basis the plaintiff failed to establish the church owed a fiduciary duty to the plaintiff. Id. at 801. The court's reasoning makes plain the entanglement of church and state in determining whether a fiduciary duty has been established. Analyzing the issue as involving a procedural lack of support in the record, the court rejected the plaintiff's argument the "Book of Discipline of the United Methodist Church" formed the basis for a fiduciary duty, chiefly because the Book of Discipline was not made a part of the appellate record. Yet, the inquiry itself makes evident the fact that the secular court would have been called on to examine the church's doctrinal teachings to otherwise resolve the issue, an examination excessively entangling the secular courts in church doctrines and policy in violation of the First Amendment.
In H.R.B. v. J.L.G., 913 S.W.2d 92 (Mo.Ct. App.1995), the court aligned itself with those cases holding the First Amendment bars a claim for breach of fiduciary duty. Id. at 98-99. The court noted other causes of action were available for misconduct, (including intentional infliction of emotional distress), and concluded religion was not merely incidental to the plaintiff's relationship with the archbishop and the church, rather "it was the foundation for [the relationship]" Id. at 99. The court reasoned a breach of fiduciary duty claim would "inevitably require inquiry into the religious aspects of this relationship, that is, the duty owed by Catholic priests, parishes, and diocese to their parishioners," a sectarian question beyond the reach of the secular court. Id.
Taking the allegations of Doe's complaint as true, Doe alleged the church defendants owed her a fiduciary duty, yet definition of that duty necessarily involves the secular court in church practices, doctrines, and belief. To establish a breach of the fiduciary duty allegedly owed to Doe by the church defendants, Doe would need to establish the church remained inactive in the face of her allegations against Evans. However, the church's policies undoubtedly differ from the rules of another employer, and may require the nonsecular employer to respond differently when faced with such allegations. When a secular court interprets church law, policies, and practices it becomes excessively entangled in religion. We align ourselves with those courts finding a First Amendment bar to a breach of fiduciary duty claim as against church defendants, concluding resolution of such a claim would necessarily require the secular court to review and interpret church law, policies, and practices.

INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
We also affirm the trial court's dismissal of Doe's "outrageous conduct" claim against the church defendants, not only because the claim would similarly be barred by *294 the First Amendment, but also due to the insufficiency of Doe's allegations to sustain a claim. Doe does not dispute the church defendants' assertion Florida does not recognize an action for "outrageous conduct." Nevertheless, a claim for intentional infliction of emotional distress may be asserted and liability will be imposed where conduct has been "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Metropolitan Life Ins. Co. v. McCarson, 467 So.2d 277 (Fla.1985). The allegations of Doe's complaint fall short of satisfying this test.
STONE, C.J., and GUNTHER, J., concur.
NOTES
[1] The First Amendment concerns that arise when considering these claims, arguments raised in the several cases to decide this issue, and arguments raised by the parties to the instant appeal are well-summarized in James T. O'Reilly and JoAnn M. Strasser, Clergy Sexual Misconduct: Confronting the Difficult Constitutional and Institutional Liability Issues, 7 St. Thomas L.Rev. 47 (1994).