771 So.2d 545 (2000)
JANE DOE I and Jane Doe II, Appellants,
v.
Jan MALICKI, St. David Catholic Church and the Archdiocese Of Miami, Appellees.
No. 3D99-549.
District Court of Appeal of Florida, Third District.
July 26, 2000.
Motion for Certification and Rehearing Denied December 7, 2000.
Cain & Snihur and May L. Cain and William J. Snihur, Jr., Miami, for appellants.
Gilbride, Heller & Brown and James F. Gilbride and Hetal D. Desai, Miami; J. Patrick Fitzgerald, Coral Gables, for appellees.
Caruso, Burlington, Bohn & Compiani (West Palm Beach), for Academy of Florida Trial Lawyers as amicus curiae.
Before SCHWARTZ, C.J., and FLETCHER, J., and NESBITT, Senior Judge.
FLETCHER, Judge.
Jane Doe I and Jane Doe II appeal the dismissal of their claims against St. David Catholic Church [St. David] and the Archdiocese of Miami [Archdiocese] for damages allegedly incurred as a result of being sexually assaulted by a Catholic priest on the premises of the defendant church.
At the time of the alleged incidents, Jane Doe I was a minor parishioner of St. David who worked for the church in exchange for free tuition at St. Thomas High School. Jane Doe II was a parishioner who also worked at the church in exchange *546 for her children's tuition at St. David. Plaintiffs filed a complaint against Father Jan Malicki,[1] St. David, and the Archdiocese, alleging that Father Malicki sexually molested, assaulted and/or battered them while they were employed at St. David. These allegations formed the basis for three claims against the defendants St. David and the Archdiocese(i) negligent hiring and supervision, (ii) respondeat superior, and (iii) breach of implied contract.
The defendants moved to dismiss the claims against them on the ground that they were barred by the First Amendment of the United States Constitution. The trial court agreed with the defendants and dismissed the claims against St. David and the Archdiocese. For the reasons which follow, we reverse and remand for reinstatement of plaintiffs' claims.
The First Amendment to the United States Constitution provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof...."[2] Beginning early in First Amendment jurisprudence, however, the courts recognized that although the freedom of religious beliefs guaranteed by the First Amendment is absolute, conduct based on said beliefs is nevertheless subject to regulation for the protection of society. Reynolds v. United States, 98 U.S. 145, 25 L.Ed. 244 (1878). Ever since, the courts have struggled with the problem of how best to provide this protection without becoming excessively entangled in the doctrines and internal policies of religious institutions.[3]
In recent years courts throughout the nation have confronted the issue of a religious institution's liability in response to increased litigation arising from allegations of sexual misconduct by members of the clergy. Various theories of liability have been used in an attempt to resolve any First Amendment entanglement problem. And, not surprisingly given the delicate balance between religious freedom and the protection of the public safety, there is considerable diversity in the judicial analysis employed by the different courts. See Joseph B. Conder, Liability of Church or Religious Society for Sexual Misconduct of Clergy, 5 A.L.R. 5th 530 (1993). In Florida, the Fourth and Fifth District Courts of Appeal have both been presented with cases involving clergy misconduct. Doe v. Evans, 718 So.2d 286 (Fla. 4th DCA 1998); Doe v. Dorsey, 683 So.2d 614 (Fla. 5th DCA 1996). Of the two cases, Dorsey is the more factually similar to the instant case. In that case a claim of negligent hiring or retention was brought against a church and its bishop on allegations of sexual misconduct by a priest with a minor. The plaintiff, however, was twenty-six years old when he filed the action. Because of this, the appellate court decided the case in favor of the defendants on the statute of limitations defense and did *547 not reach the First Amendment issue. Nevertheless, the court stated:
"In any event, we are persuaded that just as the State may prevent a church from offering human sacrifices, it may protect its children against injuries caused by pedophiles by authorizing civil damages against a church that knowingly (including should know) creates a situation in which such injuries are likely to occur."
683 So.2d at 617.
The Court went on to say that it would draw the line at criminal conduct.
In Evans the appellate court affirmed the dismissal of a claim for negligent hiring, supervision and retention brought by an adult parishioner against a church, diocese and bishop based on the First Amendment. The alleged misconduct in that case, however, involved a voluntary sexual relationship between the parishioner and her pastor during marital counseling. The court recognized that this presented a "less compelling factual scenario" than cases involving criminal assaults, especially against children. 718 So.2d at 289-90 ("[T]he plaintiff's allegations of `sexual relationship' in the instant case fall short of alleging criminal conduct.")
As the Evans opinion points out, there is a split of authority in other jurisdictions. Compare Martinelli v. Bridgeport Roman Catholic Diocesan Corp., 196 F.3d 409 (2d Cir.1999); Nutt v. Norwich Roman Catholic Diocese, 921 F.Supp. 66 (D.Conn.1995); Destefano v. Grabrian, 763 P.2d 275 (Colo. 1988); Jane Doe v. Hartford Roman Catholic Diocesan Corp., 45 Conn.Supp. 388, 716 A.2d 960 (1998); Konkle v. Henson, 672 N.E.2d 450 (Ind.Ct.App.1996); Mrozka v. Archdiocese of St. Paul and Minneapolis, 482 N.W.2d 806 (Minn.Ct.App. 1992); F.G. v. MacDonell, 291 N.J.Super. 262, 677 A.2d 258 (1996); Kenneth R. v. Roman Catholic Diocese of Brooklyn, 229 A.D.2d 159, 654 N.Y.S.2d 791 (1997); Byrd v. Faber, 57 Ohio St.3d 56, 565 N.E.2d 584 (1991); and Erickson v. Christenson, 99 Or.App. 104, 781 P.2d 383 (1989); with Dausch v. Rykse, 52 F.3d 1425 (7th Cir. 1994); Schmidt v. Bishop, 779 F.Supp. 321 (S.D.N.Y.1991); Teadt v. Lutheran Church Missouri Synod, 237 Mich.App. 567, 603 N.W.2d 816 (1999); and Bladen v. First Presbyterian Church of Sallisaw, 857 P.2d 789 (Okla.1993).
Most of the courts which have rejected these types of claims have done so based on the belief that to determine liability they would be required to interpret church doctrine. See, e.g., Evans, 718 So.2d at 291 ("[A] court's determination regarding whether the church defendant was `reasonable' would necessarily entangle the court in issues of the church's religious law, practices and policies.") Those courts which have accepted the claims see their role as simply applying neutral principles of law[4] to nonreligious conduct. See, e.g., Konkle, 672 N.E.2d at 456 ("[R]eview of [plaintiff's] claim does not require any inquiry into religious doctrine or practice. [Defendant's] actions were not religiously motivated. Instead, review only requires the court to determine if the Church Defendant knew of [defendant's] inappropriate conduct, yet failed to protect third parties from him.").
After carefully reviewing the case law, and taking into consideration the particular factual allegations herein, we find the latter cases to be more persuasive. In their complaint, the plaintiffs alleged that they were both employees and parishioners of the defendant church, that they were sexually assaulted and/or battered by Father Malicki while working at the defendant church, and that, despite knowing that Father Malicki had committed several sexual assaults and/or batteries, he was retained by the defendants as a priest and given the task of supervising the plaintiffs. *548 The issue to be determined by the court, therefore, is whether the defendants had reason to know of Father Malicki's misconduct and did nothing to prevent reasonably foreseeable harm from being inflicted upon the plaintiffs. This determination is one governed by tort law and does not require inquiry into the religious doctrines and practices of the Catholic church.
Accordingly, we reverse and remand this cause for reinstatement of the plaintiffs' complaint.
NESBITT, Senior Judge, concurs.
SCHWARTZ, Chief Judge (dissenting).
The basis of my respectful but entire disagreement with the court lies in my inability to accept the proposition which forms the foundation of its conclusion: that the determination of whether the defendant church is liable for negligence in its hiring, retention or supervision of a priest is governed by neutral principles of "tort law and does not require inquiry into religious doctrines and practices of the Catholic Church." To my mind, the notion that the relationships between the church, its bishops and its priestsand any consequent tort responsibility for hiring, firing, retention and assignmentcan, much less should, be equated to those involving, say, a landlord and the custodian to whom it entrusts the keys to his tenants' apartments, Mallory v. O'Neil, 69 So.2d 313 (Fla.1954); Tallahassee Furniture Co. v. Harrison, 583 So.2d 744 (Fla. 1st DCA 1991), review denied, 595 So.2d 558 (Fla. 1992), is not only unsupportable, but demeaning to the religion itself. It is fundamentally, constitutionally impermissible for a judge or jury to determine whether civil liability arises from decisions made in such an obviously sectarian context and upon such an obviously non-secular basis. In Goodman v. Temple Shir Ami, 712 So.2d 775 (Fla. 3d DCA), review granted, 727 So.2d 905 (Fla.1998), appeal dismissed, 737 So.2d 1077 (Fla.1999), cert. denied, 528 U.S. 1075, 120 S.Ct. 789, 145 L.Ed.2d 666 (2000), this court itself recognized that whether a congregation has "good cause" to fire its rabbi is so infused with issues of the clergyman's doctrinal acceptability that "ordinary" principles of contract law cannot be properly applied with the result that an otherwise "ordinary" contract of employment is rendered unenforceable by the First Amendment. The present situation, in which the ineffable, mystic interconnections among church, bishop, priest, and congregant are involved presents, if anything, an a fortiori situation. On these grounds, in Swanson v. Roman Catholic Bishop of Portland, 692 A.2d 441 (Me. 1997), the court held, as I would, that claims identical to those asserted here may not be maintained. The court said:
It would ... be inappropriate and unconstitutional for this Court to determine after the fact that the ecclesiastical authorities negligently supervised or retained the defendant.... Any award of damages would have a chilling effect leading indirectly to state control over the future conduct of affairs of a religious denomination ... Pastoral supervision is an ecclesiastical prerogative.
* * *
We conclude that, on the facts of this case, imposing a secular duty of supervision on the church and enforcing that duty through civil liability would restrict its freedom to interact with its clergy in the manner deemed proper by ecclesiastical authorities and would not serve a societal interest sufficient to overcome the religious freedoms inhibited.
Swanson, 692 A.2d at 445.
When a civil court undertakes to compare the relationship between a religious institution and its clergy with the agency relationship of the business world, secular duties are necessarily introduced into the ecclesiastical relationship and the risk of constitutional violation is evident.... To permit civil courts to probe deeply enough into the allocation of power within a [hierarchical] church *549 so as to decide ... religious law [governing church policy] ... would violate the First Amendment in much the same manner as civil determination of religious doctrine.
* * *
Even assuming that the trial court could discern the existence of actual authority without determining questions of church doctrine or polity or could base the requisite agency relationship on apparent authority, constitutional obstacles remain. The imposition of secular duties and liability on the church as a "principal" will infringe upon its right to determine the standards governing the relationship between the church, its bishop, and the parish priest.
* * *
Because of the existence of these constitutionally protected beliefs governing ecclesiastical relationships, clergy members cannot be treated in the law as though they were common law employees. "The traditional denominations each have their own intricate principles of governance, as to which the state has no rights of visitation." ... To import agency principles wholesale into church governance and to impose liability for any deviation from the secular standard is to impair the free exercise of religion and to control denominational governance.
Swanson, 692 A.2d at 444-45. Similarly, in Heroux v. Roman Catholic Bishop of Providence, No. C.A. PC 92-5807, 1998 WL 388298,*9 (R.I.Super.1998), the court said:
This Court is satisfied that in order for it to determine whether or not the relation between a bishop and his priests is sufficiently agent-like to give rise to a common law duty to exercise reasonable care in the exercise of whatever supervisory authority the bishop has the Court is required to examine and analyze the rules, policies and doctrine of the Roman Catholic Church. That examination and analysis is prohibited by the First Amendment. The same prohibition will prevent this Court from analyzing those rules, doctrines and policies of the Roman Catholic religion to determine what the hierarchical defendants should have known, as distinguished from what they actually knew.
* * *
This Court concludes from its analysis of the authorities ... that this Court lacks jurisdiction to adjudicate claims that the hierarchical defendants negligently hired, retained, disciplined or counseled their subordinate priests. Inquiry into such matters would plainly take this Court into religious questions beyond its jurisdiction. Claims arising out of allegations of negligent supervision based on what the hierarchical defendants should have known ... require the same invasion into religious rules and policy.... It does not matter whether the legal theory under which the claims are brought is ordinary negligence, premises liability, breach of fiduciary relations, misrepresentation by concealment, or breach of parental responsibility by one in loco parentis. So long as the asserted cause of the injury alleged to be compensable by damages is a failure merely to exercise reasonable care to control the conduct of a religious subordinate, this Court will lack jurisdiction to adjudicate the claim.
Accord, e.g., Scharon v. St. Luke's Episcopal Presbyterian Hospitals, 929 F.2d 360 (8th Cir.1991); Pritzlaff v. Archdiocese of Milwaukee, 194 Wis.2d 302, 533 N.W.2d 780 (1995), cert. denied, 516 U.S. 1116, 116 S.Ct. 920, 133 L.Ed.2d 849 (1996). As the Fourth District said in Doe v. Evans, 718 So.2d 286, 291 (Fla. 4th DCA 1998), review granted, 735 So.2d 1284 (Fla.1999):
Our examination of case law presenting both sides of this question leads us to conclude the reasoning of those courts *550 holding the First Amendment bars a claim for negligent hiring, retention, and supervision is more compelling. In a church defendant's determination to hire or retain a minister, or in its capacity as supervisor of that minister, a church defendant's conduct is guided by religious doctrine and/or practice. Thus, a court's determination regarding whether the church defendant's conduct was "reasonable" would necessarily entangle the court in issues of the church's religious law, practices, and policies. "Hiring" in a traditional sense does not occur in some religions, where a person is ordained into a particular position in the church, and assigned to one parish or another. A court faced with the task of determining a claim of negligent hiring, retention, and supervision would measure the church defendants' conduct against that of a reasonable employer; a proscribed comparison.
Evans, 718 So.2d at 291.
The Archdiocese could be held liable in this case only if the jury determined either that it did not act as a reasonable businessman or as a reasonable church. Because the former process is inconceivable and the latter unconstitutional, I would affirm.
NOTES
[1] The claims against Father Malicki are not part of this appeal.
[2] Florida's Constitution contains a similar provision. Fla. Const. art. I, § 3 ("There shall be no law respecting the establishment of religion or prohibiting or penalizing the free exercise thereof.").
[3] See, e.g., Employment Div., Dep't of Human Resources of Or. v. Smith, 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990) (upholding law making ingestion of peyote illegal even if used for sacramental purposes during ceremony of Native American church); Cantwell v. State of Connecticut, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940) (rejecting law requiring prior approval by government official who determines whether cause is a religious one before allowing solicitation); Prince v. Commonwealth of Massachusetts, 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944) (applying to Jehovah's Witnesses law prohibiting children from selling on public streets); Sherbert v. Verner, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963) (holding eligibility provisions of unemployment compensation law unconstitutional when applied to Seventh-day Adventist keeping the Sabbath); Wisconsin v. Yoder, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972) (ruling law requiring compulsory education to the age of sixteen unconstitutional as against Amish parents' religious objection to such education); and Reynolds, 98 U.S. 145, 25 L.Ed. 244 (affirming a Mormon's conviction on charges of bigamy).
[4] It is well settled that applying neutral principles of law to the secular conduct of a religious institution does not violate the First Amendment. Jones v. Wolf, 443 U.S. 595, 99 S.Ct. 3020, 61 L.Ed.2d 775 (1979).