[No. 49309-4-I. Division One. September 16, 2002.]

S.H.C., ET AL., *Appellants*, v. SHENG-YEN LU, ET AL., *Respondents*.

512

*Rebecca J. Roe* and *Kathryn Goater* (of *Schroeter, Goldmark & Bender, P.S.*), for appellants.

*M. Colleen Barrett* and *Gregory S. Worden* (of *Barrett & Worden, P.S.*), for respondents.

Cox, A.C.J. — The First Amendment does not provide religious organizations with absolute immunity from liability for tortious conduct.[1] If such liability is predicated on secular conduct and does not involve the interpretation of church doctrine or religious beliefs, there is no violation of the Constitution.[2] Here, S.H.C. claims that the Ling Shen Ching Tze Temple, Inc., (Temple) is vicariously liable under various theories for alleged sexual acts committed by Grandmaster Sheng-Yen Lu (Grandmaster Lu). He is the

---

[1] *C.J.C. v. Corp. of the Catholic Bishop*, 138 Wn.2d 699, 727-28, 985 P.2d 262 (1999).

[2] *C.J.C.*, 138 Wn.2d at 727-28.

spiritual leader and founder of the True Buddha religion practiced by followers worshiping at the Temple. Because the Temple did not owe S.H.C. a duty under the facts of this case, there was no breach of fiduciary duty for which the Temple is liable. Moreover, the negligent supervision/retention claim and the business invitee claim are barred by the First Amendment. Finally, this record does not support any claim under the alternative theories of alter ego, ostensible agency, or negligent pastoral counseling. Accordingly, we affirm the order granting summary judgment of dismissal to the Temple.

Grandmaster Lu founded the True Buddha School, a denomination of Buddhism. The Temple is a Buddhist temple and associated monastic community of the True Buddha School. The practice of the True Buddha School is a combination of Taoism, sectarian Buddhism, and Tantric Buddhism. Grandmaster Lu is recognized by followers of the True Buddha School as a living Buddha.

S.H.C. became a follower of Grandmaster Lu in 1992. Sometime in 1996 she began to go to the Temple to receive blessings because she was not feeling well. During her stays there, she had headaches. According to S.H.C., Grandmaster Lu told her that he could cure the headaches. She also claims that he told her that she would die. According to her, Grandmaster Lu told her that he could save her life and cure her illness by the "Twin Body Blessing."

The "blessing" was, in fact, sexual intercourse, which S.H.C. engaged in with Grandmaster Lu multiple times from 1996 to 1999. She maintains that he assured her that this "blessing" would save her life. Only when she did not die, and after she saw him approach other women in similar ways, did she realize that he had tricked her.

S.H.C. sued Grandmaster Lu for negligent and/or intentional infliction of emotional distress, outrage, breach of fiduciary duty, and negligent pastoral counseling. Her suit against the Temple included claims for breach of fiduciary duty, negligent pastoral counseling, and negligent retention and supervision of Grandmaster Lu.

The Temple moved for summary judgment on all claims against it, and the trial court granted this motion. Thereafter, S.H.C. and the Temple moved for entry of a final judgment as to the claims against the Temple only, which the trial court granted.

S.H.C. appeals.

We first establish certain parameters of our decision. Although the Temple concedes that factual questions preclude dismissal of Grandmaster Lu, the claims of S.H.C. against him are not presently before us.[3] For purposes of the summary judgment motion of the Temple that is before us, we assume, without deciding, that Grandmaster Lu is liable for one or more of the claims that S.H.C. asserts against him. Our focus here is on the claims against the Temple that the trial court dismissed.

■ As to those claims, we first decide which claims are potentially valid; and it is only then that we reach the First Amendment questions.[4]

## NEGLIGENT SUPERVISION

S.H.C. argues that the court erred in dismissing her claim for negligent supervision. Specifically, S.H.C. argues that the First Amendment does not bar review of the claim. We disagree.

■ We may affirm an order granting summary judgment if there are no genuine issues of material fact and the

---

[3] The trial court ruled that S.H.C.'s claim against Grandmaster Lu for negligent pastoral counseling might be sustained if that counseling was essentially secular, not religious. *See C.J.C.*, 138 Wn.2d at 728 (citing *Sanders v. Casa View Baptist Church*, 134 F.3d 331, 336 (5th Cir.), *cert. denied*, 525 U.S. 868 (1998)). But the trial court noted that it was premature at the summary judgment stage to decide whether the "Twin Body Blessing," the specific conduct at issue in this case, would require the court to choose between competing interpretations of church doctrine with respect to the claims against Grandmaster Lu. We agree with the trial court's assessment, and do not further address the liability of Grandmaster Lu.

[4] *State v. Hall*, 95 Wn.2d 536, 539, 627 P.2d 101 (1981) (reviewing court should not pass on constitutional issues unless absolutely necessary to the determination of the case).

moving party is entitled to judgment as a matter of law.[5] Summary judgment is proper when reasonable minds could reach but one conclusion regarding the material facts.[6] A material fact is one on which the outcome of litigation depends.[7] All facts and reasonable inferences must be considered in the light most favorable to the nonmoving party.[8] We review questions of law de novo.[9]

"Negligent supervision creates a limited duty to control an employee for the protection of a third person, even when the employee is acting outside the scope of employment."[10] Employer liability for negligent hiring, retention, and supervision arises from this duty. "If an employee conducts negligent acts outside the scope of employment, the employer may be liable for negligent supervision."[11] An employer is not liable for negligent supervision of an employee unless the employer knew, or in the exercise of reasonable care should have known, that the employee presented a risk of danger to others.[12]

The parties dispute whether Grandmaster Lu is an employee of the Temple. They also dispute whether the Temple had knowledge of Grandmaster Lu's alleged acts. We address the second point, and need not address the first. Viewing the evidence in the light most favorable to S.H.C.,

---

[5] CR 56(c).

[6] *Dien Tran v. State Farm Fire & Cas. Co.*, 136 Wn.2d 214, 223, 961 P.2d 358 (1998).

[7] *Greater Harbor 2000 v. City of Seattle*, 132 Wn.2d 267, 279, 937 P.2d 1082 (1997).

[8] *Mountain Park Homeowners Ass'n v. Tydings*, 125 Wn.2d 337, 341, 883 P.2d 1383 (1994).

[9] *Mains Farm Homeowners Ass'n v. Worthington*, 121 Wn.2d 810, 813, 854 P.2d 1072 (1993).

[10] *Rodriguez v. Perez*, 99 Wn. App. 439, 451, 994 P.2d 874, *review denied*, 141 Wn.2d 1020 (2000) (citing *Niece v. Elmview Group Home*, 131 Wn.2d 39, 48, 929 P.2d 420 (1997)).

[11] *Rodriguez*, 99 Wn. App. at 451.

[12] *Niece*, 131 Wn.2d at 48-49.

the nonmoving party, there are genuine issues of fact as to the Temple's notice of improper activities.

S.H.C. testified that Temple officials were aware that her interactions with Grandmaster Lu were "out of the ordinary or unacceptable for interactions by followers." She states that one of the Temple's nuns saw her leave a closed door consultation room after she was alone with Grandmaster Lu. She further states that one of the Temple's monks scolded her for approaching Grandmaster Lu because followers were not supposed to approach and speak with him. She also states that on another occasion several nuns saw Grandmaster Lu approach her in the Temple, take her into an office, and close the door. She states that Temple personnel summoned her to Grandmaster Lu's presence and that masters, monks, and nuns saw her leave Grandmaster Lu's bedroom. Finally, she states that one of the Temple's nuns warned her that they were keeping track of how much time she spent with Grandmaster Lu, that she should stop having consultations with him, and that she should not have consultations with the door locked. This evidence is sufficient to create a factual issue that the Temple was on notice of Grandmaster Lu's activities, subject only to the question of whether the factual issue is material for summary judgment purposes.

The Temple also argues that S.H.C. has failed to show that the Temple had the authority to control Grandmaster Lu. Again, this presents a genuine factual issue. Even if the Temple has no authority to supervise or terminate Grandmaster Lu "in his capacity as Spiritual Leader of the True Buddha religion," as Temple President Master Teck Hui Teng testified, S.H.C. did introduce evidence that the Temple officials had the authority to exclude Grandmaster Lu from the Temple grounds. Thus, on the question of control, there are also genuine issues of fact.

Because there were genuine issues of fact regarding notice and control, we must now turn to the question of whether those factual issues are material. Because the

First Amendment bars consideration of this claim, we hold they are not.

Clergy sexual misconduct and the consequences that flow from such misconduct continue to be the subjects of much litigation.[13] A principal question for religious institutions associated with clergy accused of sexual misconduct is whether the First Amendment bars vicarious liability for such institutions.[14] Resolution of this question has, by no means, been uniform either among or within jurisdictions that have considered the issue.[15]

In Washington, *C.J.C. v. Corp. of the Catholic Bishop*, 138 Wn.2d 699, 985 P.2d 262 (1999), presented this question. Our state supreme court rejected the argument by a church that the First Amendment barred the court from imposing a duty on the church to take reasonable measures to prevent harm intentionally inflicted on children by a church worker. In that case, the court considered three consolidated cases regarding negligence claims brought against church entities and individual church officials. The defendants included officials who did not themselves directly perpetrate intentional acts of childhood sexual abuse, but who allegedly failed to protect the child victims or otherwise prevent the abuse.

The court considered the question of First Amendment protections in its discussion of one of the three consolidated cases, *Funkhouser v. Wilson*.[16] In that case, three daughters of a former pastor of the Calvary Baptist Church of Twisp

---

[13] *See* James T. O'Reilly & JoAnn M. Strasser, *Clergy Sexual Misconduct: Confronting the Difficult Constitutional and Institutional Liability Issues*, 7 St. Thomas L. Rev. 31 (Fall 1994); Zanita E. Fenton, *Faith in Justice: Fiduciaries, Malpractice and Sexual Abuse by Clergy*, 8 Mich. J. Gender & L. 45 (2001).

[14] O'Reilly & Strasser, *supra*, n.13, at 43-45.

[15] *See Doe v. Evans*, 718 So. 2d 286 (1998) (surveying cases addressing negligent supervision claims and the First Amendment); *L.L.N. v. Clauder*, 209 Wis. 2d 674, 563 N.W.2d 434 (1997) (reversing a lower court's decision on whether the First Amendment was a bar to a negligent supervision claim); *Swanson v. Roman Catholic Bishop*, 1997 ME 63, 692 A.2d 441 (holding negligent supervision claim against church barred by First Amendment).

[16] Consolidated with *C.J.C.*, 138 Wn.2d at 720.

(Church) sued the Church and Orin Wilson, a prominent member and onetime deacon of the Church. They claimed Wilson molested them when they were children. Although a Church elder had been warned that Wilson had had inappropriate sexual contact with a child, Wilson was "made a deacon and was entrusted with various leadership positions within the Church that allegedly provided extensive contact with and authority over children."[17] The Church elder who was warned failed to alert the plaintiffs or their father of the accusations against Wilson. The state supreme court held that the Church owed a duty of reasonable care to affirmatively act to prevent the harm the children suffered, in view of its special protective relationship to them, its relationship to Wilson, and the knowledge the Church allegedly possessed.[18]

■ Our supreme court then considered whether the claims against the Church were barred by the First Amendment. The court stated that "[t]he First Amendment does not provide churches with absolute immunity to engage in tortious conduct. So long as liability is predicated on secular conduct and does not involve the interpretation of church doctrine or religious beliefs, it does not offend constitutional principles."[19] The court held that because these principles were not offended by the case before it, there was no constitutional bar to the claim.

In *Germain v. Pullman Baptist Church*,[20] another division of this court held, at about the same time as the *C.J.C.* decision, that a negligent supervision claim was barred by the First Amendment under the facts of the case. But the court declined to decide whether the First Amendment forecloses all such claims against religious entities based on the conduct of their leaders.[21] That case considered allega-

---

[17] *C.J.C.*, 138 Wn.2d at 720.

[18] *C.J.C.*, 138 Wn.2d at 727.

[19] *C.J.C.*, 138 Wn.2d at 727-28 (citing *Sanders*, 134 F.3d at 336).

[20] 96 Wn. App. 826, 980 P.2d 809 (1999), *review denied*, 139 Wn.2d 1026 (2000).

[21] *Germain*, 96 Wn. App. at 836-37.

tions of sexual misconduct by a pastor of a Baptist Church. The plaintiffs alleged that the church's board of deacons were aware of or should have been aware of the pastor's actions. This court held that for the court to determine whether to impose liability would require that it "consider and interpret the church's laws and constitution" because the authority to discharge the pastor was vested in the entire congregation, not in the board of deacons.[22]

These two cases are consistent with general principles that the United States Supreme Court and other courts have articulated. In *Jones v. Wolf*,[23] the Supreme Court articulated the issue to be whether civil courts may resolve the dispute on the basis of "neutral principles of law," or whether they must defer to the resolution of an authoritative religious tribunal to resolve a dispute over religious doctrine.

In *C.J.C.*, our supreme court discussed this state's "strong public policy in favor of protecting children against acts of sexual abuse."[24] The court noted that the legislature had "made clear that the prevention of child abuse is of 'the highest priority, and all instances of child abuse must be reported to the proper authorities who should diligently and expeditiously take appropriate action . . . .' "[25] The court also noted that the legislature had made it a criminal offense for some professionals to fail to notify the proper authorities when there is reason to suspect childhood sexual abuse.[26] Concluding that the enforcement of these strong public policies did not offend the First Amendment, the court allowed enforcement of the claim against the church. Here, unlike the case in *C.J.C.*, the court would have to examine the religious doctrine of the True Buddhist

[22] *Germain*, 96 Wn. App. at 837 (citing *L.L.N.*, 563 N.W.2d at 441 and *Swanson*, 692 A.2d 441).

[23] 443 U.S. 595, 99 S. Ct. 3020, 61 L. Ed. 2d 775 (1979).

[24] *C.J.C.*, 138 Wn.2d at 726.

[25] *C.J.C.*, 138 Wn.2d at 727 (quoting LAWS OF 1985, ch. 259 (legislative findings appended to RCW 26.44.030)).

[26] *C.J.C.*, 138 Wn.2d at 726.

faith to determine whether the Temple was negligent in its "supervision and retention" of Grandmaster Lu. That necessarily would involve the "excessive entanglement that First Amendment jurisprudence forbids."

■ Here, the evidence in the record shows that the Temple and its followers regard Grandmaster Lu as a Living Buddha—one to whom they have an obligation of obedience. These religious followers also believe that they are bound by the 50 stanzas of guru devotion to Grandmaster Lu. Those stanzas state that the follower should "see only good qualities in [Grandmaster Lu], and never any faults." They further state that if Grandmaster Lu "acts in a seemingly unenlightened manner" the follower should remember that "your own opinions are unreliable and the apparent faults you see may only be a reflection of your own deluded state of mind."

Moreover, as the trial court noted, the Precepts of the True Buddha School state that:

> If, after taking refuge, one discovers that the Guru is really a phony and without any achievement in Dharma, then one should depart from the Guru and take refuge in another true Guru. With regard to the original Guru, however, ... *one should not criticize nor slander the former Guru.*[27]

If a civil court were to review the conduct of the Temple to determine whether it should have exercised more or better supervision of Grandmaster Lu, that court would necessarily entangle itself in the religious precepts and beliefs set forth above. The truth of the above beliefs is not open to question by civil courts. Should the Temple have been other than "obedient" to Grandmaster Lu under the circumstances of this case? Should the Temple have seen faults in or "criticized" him? Should the Temple have "slandered" him by calling into question the activities of which it had knowledge? We can see no way that a civil court could avoid interpreting the above religious doctrine in determining whether the Temple was liable for negligent supervision

---

[27] (Emphasis added.)

and retention. In short, there are no neutral principles of law governing this case that would permit a civil court to resolve the question of liability against the Temple.

Furthermore, it is arguable that in fashioning a "reasonable religious organization" standard for the Temple, there is danger that standard would vary, for example, from a "reasonable Protestant" standard, a "reasonable Catholic" standard, a "reasonable Jewish" standard, or a "reasonable Islamic" standard. In short, entanglement in the doctrine of this church and others would be inevitable.[28]

The trial court correctly concluded that it would have to examine True Buddha School doctrine to determine whether the Temple acted reasonably. Such a determination would excessively entangle the court in the religious doctrine of the Temple, and is barred by the First Amendment.

S.H.C. argues that the cause of action here must be measured against secular concepts of liability. The implication of this argument is that if we do so, she will prevail. But focusing on whether the alleged activity by Grandmaster Lu is secular does not fully address the constitutional issue: whether resolution of the legal issues necessarily would require a civil court to become involved in interpreting church doctrine to determine the Temple's liability. Thus, although the alleged activities of Grandmaster Lu may be secular in this case, that does not address whether a civil court may avoid interpreting doctrine of the True Buddha religion to address whether the Temple is liable for negligent supervision.

S.H.C. further argues that we should rigorously examine First Amendment claims lest we institutionally establish religion by allowing conduct not permitted in secular situations. We have rigorously examined the claim, and conclude that the First Amendment is validly asserted as a bar to the Temple's liability in this case.

---

[28] *See L.L.N.*, 563 N.W.2d at 441-43.

The cases S.H.C. cites to argue otherwise are not helpful. In the passage S.H.C. cites from *Sanders v. Casa View Baptist Church*, cited approvingly in *C.J.C.*, the court in the other jurisdiction was discussing a claim against the minister who allegedly committed malpractice, not the church employer.[29] And we simply disagree with the Illinois Appellate Court's holding in *Bivin v. Wright*.[30]

The trial court properly dismissed on summary judgment the negligent supervision claim.

## BREACH OF FIDUCIARY DUTY

S.H.C. next argues that the trial court erred by ruling that there was no basis in this case for imposing a fiduciary duty on the Temple, distinguishing this case from that of *C.J.C.* We decline the invitation to extend *C.J.C.* to the matter now before us.

 Whether a legal fiduciary duty exists is a question of law.[31] We review questions of law de novo.[32]

 As we previously explained in this opinion, in *C.J.C.* one of the consolidated cases involved claims by three adult sisters against a church based on their sexual molestation by a prominent church member while they were minors. In that connection, the court first addressed whether a church and its officials have a special relationship with either its workers or the children of its congregation giving rise to a duty to take reasonable measures to prevent harm intentionally inflicted on the children by a church worker.[33] The

---

[29] 134 F.3d 331, 337-38 (5th Cir. 1998).

[30] 275 Ill. App. 3d 899, 656 N.E.2d 1121, 212 Ill. Dec. 287 (1995) (trial court abused its discretion by dismissing complaint for failure to state a cause of action where minister's sexual misconduct was outside the boundaries of the church's ecclesiastical beliefs and practices, because court may not be required to interpret church doctrine or regulation of ecclesiastical activity).

[31] *Miller v. U.S. Bank of Wash.*, 72 Wn. App. 416, 426, 865 P.2d 536 (1994).

[32] *Mains Farm Homeowners Ass'n*, 121 Wn.2d at 813.

[33] *C.J.C.*, 138 Wn.2d at 720.

court identified what types of special relationships give rise to a duty to prevent intentional harm to victims:

> Thus, for instance, a school has a duty to protect students within its custody from reasonably anticipated dangers, an innkeeper has a duty to protect its guests, and a hospital its patients. *See Niece* [*v. Elmview Group Home*], 131 Wn.2d [39,] 44-45[ ,929 P.2d 420 (1997)] (citing cases).[34]

The court went on to hold that because the activities of a church are similar to those of a school, the duty of protection of children is the same.[35] The court also noted that its approach was consistent with other cases imposing a duty of protection.[36]

 The obvious distinction between this case and *C.J.C.* is that this case involves allegations by an adult of sexual improprieties. In contrast, *C.J.C.* involved such improprieties against children, a group protected by criminal statutes and other public policies. Moreover, none of the other relationships between an alleged victim and an entity associated with the accused that our courts have characterized as "special" appears to be analogous to this situation. S.H.C. has not shown that she was a particularly vulnerable victim, like the children abused by the church worker in *C.J.C.* Likewise, she is unlike the victims who have been

---

[34] *C.J.C.*, 138 Wn.2d at 721.

[35] *C.J.C.*, 138 Wn.2d at 722.

[36] *See, e.g., La Lone v. Smith*, 39 Wn.2d 167, 172, 234 P.2d 893 (1951) (employer liable for employee's criminal assault on third person "because the employer antecedently had reason to believe that an undue risk of harm would exist because of the employment"); *Taggart v. State*, 118 Wn.2d 195, 223-24, 822 P.2d 243 (1992) (special relationship giving rise to a duty to prevent intentional harm need not be "custodial or continuous," but arises where ability to supervise is present and necessity for such supervision is or should be known); *Petersen v. State*, 100 Wn.2d 421, 428-29, 671 P.2d 230 (1983) (psychiatrist-patient relationship gives rise to duty to take reasonable precautions to protect all persons foreseeably endangered by mental patient's release into community). *Compare Carlsen v. Wackenhut Corp.*, 73 Wn. App. 247, 256, 868 P.2d 882, *review denied*, 124 Wn.2d 1022 (1994) (employer liable for security guard's attempted rape if employer knew of or should have known of guard's violent propensities and nevertheless conferred position of authority and responsibility), *with Peck v. Siau*, 65 Wn. App. 285, 289, 292-94, 827 P.2d 1108, *review denied*, 120 Wn.2d 1005 (1992) (school not liable for teacher's off-campus sexual assault of student where it did not know, nor reasonably should have known, of the risk posed by teacher); *C.J.C.*, 138 Wn.2d at 724-25.

found to be vulnerable in other cases, creating a "special relationship" between the victims and a defendant other than the abuser. The victim in *Niece*, for example, was a profoundly developmentally disabled resident of a group home who was assaulted by an employee of the group home.[37] In *Shepard v. Mielke*,[38] this court determined that a resident of a convalescent care center who had suffered brain damage had a "special relationship" with the center because of her inability to protect herself.[39]

Here, the vulnerability on which S.H.C. chiefly appears to base her claim is her belief as a devoted follower of Grandmaster Lu. This approach appears to be outside the scope of the numerous cases defining special relationship that *C.J.C.* cited in this opinion, and that we have located in this jurisdiction.[40]

In short, present Washington case authority does not support the conclusion that an adult victim of sexual abuse has a special relationship with a religious organization associated with the alleged abuser.

S.H.C. also relies on authority from other jurisdictions. But each of the cases she cites is distinguishable. *Sanders*,[41] which our supreme court cited approvingly in *C.J.C.*, upheld a jury determination that a minister who engaged in sexual misconduct with two women while providing them each marital counseling breached a fiduciary duty to each of them.[42] *Sanders* is factually distinguishable, because the court in that case addressed the suit against the minister,

---

[37] *Niece v. Elmview Group Home*, 131 Wn.2d 39, 42, 929 P.2d 420 (1997).

[38] 75 Wn. App. 201, 877 P.2d 220 (1994).

[39] *Shepard*, 75 Wn. App. at 205.

[40] Citing *American Home Assurance Co. v. Cohen*, 124 Wn.2d 865, 881 P.2d 1001 (1994) and *In re Disciplinary Proceeding Against Halverson*, 140 Wn.2d 475, 998 P.2d 833 (2000), S.H.C. claims a fiduciary relationship exists between her and the Temple. The first case deals with a psychologist, the second with an attorney. Both involve allegations of improper sexual conduct. Neither addresses the liability of a third party, one not involved in the abuse. Thus, neither is helpful here.

[41] 134 F.3d 331 (5th Cir.), *cert. denied*, 525 U.S. 868 (1998).

[42] *Sanders*, 134 F.3d at 337-38.

not the religious entity he served. *Enderle v. Trautman*,[43] which S.H.C. also cites, is similarly distinguishable. Accordingly, we cannot agree that a fiduciary relationship between S.H.C. and the Temple existed.

Summary judgment on this claim was also proper.

## BUSINESS INVITEE

S.H.C. also argues that the Temple owed her a duty to protect her from harm because she was its business invitee. The trial court concluded this claim was barred by the First Amendment, and so do we.

■ Our supreme court, in *Nivens v. 7-11 Hoagy's Corner*,[44] held that a business owes a duty to its invitees to protect them from imminent criminal harm and reasonably foreseeable criminal conduct by third persons. The court held that a business owner must take reasonable steps to prevent such harm.[45] Our state supreme court had earlier adopted[46] the *Restatement (Second) of Torts* § 315, at 122 (1965), which states:

> There is no duty so to control the conduct of a third person as to prevent him from causing physical harm to another unless
>
> (a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or
>
> (b) a special relation exists between the actor and the other which gives to the other a right to protection.

In *Nivens*, the court held that a business owner has a "special relationship" with a business invitee in this sense.

---

[43] 2001 U.S. Dist. LEXIS 20181, 2001 WL 1820145 (D.N.D. Dec. 3, 2001).

[44] 133 Wn.2d 192, 943 P.2d 286 (1997).

[45] *Nivens*, 133 Wn.2d at 205.

[46] *Petersen*, 100 Wn.2d at 426.

■ Citing several cases, the Temple argues that the *Nivens* duty is limited to criminal acts.[47] The Temple also argues that the conduct in this case was distinguishable because it was merely consensual sex between adults, not intentionally tortious activity. Viewing the evidence in the light most favorable to S.H.C., the nonmoving party, questions of fact remain as to whether the conduct was, in fact, an intentional tort. But we need not resolve either the factual or legal issues that those arguments of the Temple raise.

■ As we concluded in our discussion of S.H.C.'s negligent supervision claim, the First Amendment bars consideration of this claim by a civil court. Thus, the factual disputes are not material for summary judgment purposes.

Assuming S.H.C. is the business invitee of the Temple, the duty imposed by *Nivens* is to protect her from reasonably foreseeable harmful conduct by others. But such an inquiry with respect to the Temple necessarily would involve excessive entanglement with doctrine of the True Buddha Church. Could the Temple reasonably foresee harm by its Living Buddha to another? In doing so, would that run contrary to its duty of obedience to him? Would it also involve criticism of Grandmaster Lu? A civil court could not determine the duty here without violating the First Amendment.

The trial court correctly dismissed this claim.

## OSTENSIBLE AGENCY

S.H.C. argues that the trial court erred in dismissing her claim that the Temple is liable because Grandmaster Lu was its ostensible agent. Because the claim of ostensible agency is really a claim of respondeat superior for sexual misconduct, there is no basis for liability of the Temple.

---

[47] *Johnson v. State*, 77 Wn. App. 934, 894 P.2d 1366, *review denied*, 127 Wn.2d 1020 (1995) (state university dormitory resident raped on campus); *Niece*, 131 Wn.2d at 51 (sexual assault of a developmentally disabled resident of a group home by a staff member); *C.J.C.*, 138 Wn.2d at 721.

In *Adamski v. Tacoma General Hospital*,[48] this court considered whether a hospital could be held liable for the negligence of an emergency room doctor. The hospital argued that it could not be held liable under a theory of respondeat superior because the doctor was an independent contractor, and therefore not an agent of the hospital. This court held that the jury could have found that the hospital held itself out as providing emergency care services to the public, and that the hospital could be held liable for the doctor's actions as its ostensible agent.[49] This court did not distinguish between a hospital's liability under a theory of respondeat superior and a theory of ostensible agency.

■ Our supreme court in *C.J.C.* affirmed that neither current Washington case law nor considerations of public policy favors the imposition of respondeat superior or strict liability for an employee's intentional sexual misconduct.[50] That is precisely the claim here, and the law does not support it.

The trial court properly dismissed this claim.

## ALTER EGO

S.H.C. argues she has a viable claim that the Temple was liable as Grandmaster Lu's "alter ego." We disagree.

■ S.H.C. cites one Washington case that actually discussed the "alter ego" theory. In that case, our supreme court stated that the alter ego theory, which allows a court to pierce the corporate veil and impose personal liability upon a principal, "is applied when the corporate entity has been disregarded by the principals themselves so that there is such a unity of ownership and interest that the separateness of the corporation has ceased to exist."[51] But S.H.C.

---

[48] 20 Wn. App. 98, 579 P.2d 970 (1978).

[49] *Adamski*, 20 Wn. App. at 115-16.

[50] *C.J.C.*, 138 Wn.2d at 718-19.

[51] *Grayson v. Nordic Constr. Co.*, 92 Wn.2d 548, 553, 599 P.2d 1271 (1979) (citations omitted).

failed to show that there was such a disregard of the corporate entity by the Temple and Grandmaster Lu.

The trial court properly granted summary judgment on this claim.

S.H.C. cites to case law from other jurisdictions that considered whether a religious entity was the alter ego of a person. These cases are primarily tax cases. In *Zahra Spiritual Trust v. United States*,[52] the Fifth Circuit considered whether the trust was the alter ego of several taxpayers. In *Loving Saviour Church v. United States*,[53] the Eighth Circuit upheld a trial court determination that the Church was the alter ego of the Andersons, taxpayers who conveyed property to the Church and owed taxes. No proof in this record is akin to that shown in those cases.

S.H.C. argues that she "established complete financial intermingling of the assets of the Temple and Lu." She fails to cite to the record to support this claim, and our review of the record shows no such evidence.

The trial court did not err in granting summary judgment on this claim.

## NEGLIGENT PASTORAL COUNSELING

S.H.C. argues that the trial court erred in dismissing her claims that the Temple was liable for Lu's negligent pastoral counseling under agency principles. Again, we disagree.

S.H.C. cites two cases, *Lien v. Barnett*[54] and *Lund v. Caple*,[55] to support her argument that the tort of negligent pastoral counseling is a recognized tort in Washington. In each of these cases the court decided on the facts that the claims alleged were in fact alienation of affections, which had been eliminated as a tort in Washington. In *Lund*, our

---

[52] 910 F.2d 240 (5th Cir. 1990).

[53] 728 F.2d 1085 (8th Cir. 1984).

[54] 58 Wn. App. 680, 794 P.2d 865 (1990).

[55] 100 Wn.2d 739, 675 P.2d 226 (1984).

supreme court stated that this holding did not preclude "an action against a counselor, pastoral or otherwise, in which a counselor is negligent in treating either a husband or wife. It is conceivable that a malpractice action would be appropriate where a counselor fails to conform to an appropriate standard of care, injures the patient/spouse which in turn results in loss of consortium damages to the other spouse."[56]

We need not decide whether such a claim exists.

S.H.C. has not shown that such a claim is viable against the Temple in this case. She argues in her briefing that Grandmaster Lu has committed the tort of negligent pastoral counseling. This may be true. But she fails to explain why or how that theory would create liability for the Temple as a result. She states merely that this liability is "examined under traditional tort theories involving an entities [sic] liability for conduct of its agent." But, as we have already noted, our state supreme court has rejected the imposition of respondeat superior or strict liability for an employee's intentional sexual misconduct.[57] And we have upheld the trial court's summary judgment of S.H.C.'s other claims that the Temple is vicariously liable here. Accordingly, there is simply no basis for liability on this theory.

We affirm the trial court's grant of summary judgment dismissing all claims against the Temple.

COLEMAN and BAKER, JJ., concur.

Review denied at 149 Wn.2d 1011 (2003).

---

[56] *Lund*, 100 Wn.2d at 747.

[57] *C.J.C.*, 138 Wn.2d at 718-19.