**NOTICE:  SLIP OPINION**
**(not the court's final written decision)**

The opinion that begins on the next page is a slip opinion.  Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision.  Slip opinions can be changed by subsequent court orders.  For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion.  Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports.  An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.**  The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports.  Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| R.K.,<br><br>    Appellant,<br><br>    v.<br><br>UNITED STATES BOWLING<br>CONGRESS, a Texas organization,<br><br>    Respondent,<br><br>WASHINGTON STATE UNITED<br>STATES BOWLING CONGRESS, a<br>Washington corporation; GREATER<br>SEATTLE UNITED STATES BOWLING<br>CONGRESS, a Washington<br>corporation; GREATER SEATTLE<br>UNITED STATES BOWLING<br>CONGRESS YOUTH, a Washington<br>Non-Profit Corporation; NORTHWEST<br>CHALLENGE LEAGUE f/k/a, PUGET<br>SOUND TRAVEL LEAGUE, a<br>Washington Corporation; YOUNG<br>AMERICAN BOWLING ALLIANCE, a<br>nonstock Wisconsin Corporation;<br>WASHINGTON STATE YOUNG<br>AMERICAN BOWLING ALLIANCE, a<br>Washington Non-Profit Corporation,<br><br>    Defendants. | No. 84130-1-I<br><br>DIVISION ONE<br><br>PUBLISHED OPINION |

COBURN, J. — R.K. alleges he was sexually abused by his bowling coach, Ty Treddenbarger between 1997, when R.K. was 17, and 1999. At that time,

Citations and pincites are based on the Westlaw online version of the cited material.

No. 84130-1-I/2

Treddenbarger was president of the Washington State Young American Bowling Alliance (WS-YABA), the state subsidiary of the national association Young American Bowling Alliance (YABA). In 2005, YABA merged with other bowling organizations to form the United States Bowling Congress (USBC), which also absorbed YABA's liabilities. WS-YABA dissolved in 2010. R.K. did not report the abuse to authorities until 2017. In 2019 Treddenbarger pleaded guilty to child molestation charges related to abusing other youth bowlers between 2011 and 2013. In 2020 R.K. filed suit against WS-YABA, YABA and USBC, among other entities, alleging negligence for failure to protect him from harm. The trial court granted USBC's summary judgment motion because USBC did not have a special relationship with R.K. or Treddenbarger that established a duty to R.K. We affirm.

FACTS

For many years Ty Treddenbarger was a leader in the youth bowling community in the State of Washington. He had been an officer of WS-YABA since its inception in 1983 and became president of the organization in 1998. He was one of the founders of the Puget Sound Travel League, a league where young bowlers traveled to different bowling sites in the state to compete.

WS-YABA was a subsidiary of YABA, an organization that sought to promote youth bowling and recreational competition. YABA mainly supported independent state and local bowling organizations by providing standardized rules, equipment certification requirements, and awards for youth bowlers who competed in state and local competitions. YABA did not run state or local tournaments. Besides offering introductory coaching courses geared toward volunteers, YABA was not involved in

2

hiring, directing, tracking or monitoring coaches. YABA was not involved in youth bowlers' decisions of whether to work with a coach and who to work with.

WS-YABA created its own programs and tournaments and chose its own committees to organize those tournaments. WS-YABA could request leagues and tournaments be YABA sanctioned. WS-YABA had its own board of directors, separate and apart from YABA. Local and state organizations also chose their own volunteers according to their own procedures with no involvement from YABA. As a subsidiary of YABA, WS-YABA was required to conduct an annual state YABA championship tournament.

In 2005, YABA merged with two other national bowling associations to create the USBC. USBC assumed all liabilities of the merging corporations, including YABA. WS-YABA, although a subsidiary of YABA, was not part of the merger. WS-YABA was administratively dissolved by the Washington Secretary of State in 2010 for failing to file an annual list of officers.

In March 2017 Treddenbarger was arrested for sexually abusing and exploiting children who participated in youth bowling. Upon notification of the arrest, USBC sent a letter the same day to Treddenbarger notifying him that he was suspended from all roles that might place him in contact with a child. Up until that day, USBC was unaware of any complaints made to it, YABA, or WS-YABA about Treddenbarger. Treddenbarger ultimately pleaded guilty to four federal charges related to the production and possession of child pornography, and two state charges of child molestation.

After learning of Treddenbarger's arrest, R.K. contacted the King County Sheriff's Office and reported that he, too, had been abused as a teen by Treddenbarger in the

late '90s.  Until this point, R.K. had previously tried to suppress or forget his experience, going so far as to move across the country to attend college in 1999, destroying any pictures he had with Treddenbarger and all of his bowling memorabilia.  He had only disclosed the abuse to his parents after Treddenbarger contacted him asking to meet when R.K. returned home for the summer in 2000.  R.K. responded with an email summarizing the abuse he had been subjected to by Treddenbarger and threatened to notify authorities if Treddenbarger contacted him again.  The two had no further communications.  R.K. later disclosed the abuse to his sister and a few friends between 2006 and 2017.

R.K. first met Treddenbarger in the fall of 1996, when R.K. was 16 years old.  R.K. became more involved in bowling, and Treddenbarger, then president of WS-YABA, grew to become R.K.'s mentor and coach.  R.K. started a bowling club at his high school and joined the Puget Sound Travel League.  R.K. eventually became president of WS-YABA's youth leaders.  R.K. and Treddenbarger worked closely to plan, organize, and travel to bowling tournaments and other WS-YABA events.  Treddenbarger first started sexually abusing R.K. several months after the two met.[1]  R.K. turned 18 in December 1997, during his senior year of high school.

According to R.K., the two would travel for bowling events and Treddenbarger would molest R.K. while R.K. slept in their shared hotel room.  He woke up on multiple occasions to Treddenbarger fondling his genitals above and under R.K.'s clothing.  R.K. also remembered Treddenbarger spying on him while R.K. showered, looking through cracks in bathroom and shower doors.  The abuse continued throughout the school

_____

[1] When reviewing a summary judgment motion, we assume plaintiff's allegations are true.  Afoa v. Port of Seattle, 176 Wn.2d 460, 478, 296 P.3d 800 (2013).

No. 84130-1-I/5

year. While R.K. remembered being abused many times both before and after turning 18, he had a hard time remembering specific dates. He did recall two specific trips in 1997 before he turned 18. In the summer of 1997, he and Treddenbarger went to Las Vegas to scout a potential venue, the Orleans Casino, for the Junior World Team Challenge. R.K found a photograph from that trip taken of the marquee outside the Orleans Casino.[2] The other 1997 event where he remembered being sexually abused in a shared hotel room was at the WS-YABA bowling jamboree in Ellensburg.

When R.K. graduated high school in 1998, the two took a six-week bowling trip. They visited bowling alleys Treddenbarger considered purchasing, planned competitions, and attended a national bowling convention in Atlanta. After R.K. moved across the country to attend college in 1999, the two had minimal contact.

In 2020, R.K. filed this lawsuit against USBC, YABA, WS-YABA, and other organizational defendants[3] alleging negligence for failing to protect him from Treddenbarger's abuse.

USBC moved for summary judgment arguing that it was not liable for its predecessor's subsidiary's conduct, that it did not owe a duty of care to R.K., and that the suit was barred under the statute of limitations and that the tolling provision expanding the statute of limitations for claims arising from childhood sexual abuse did not apply. The trial court ruled that there was a genuine issue of material fact as to whether the statute of limitations properly tolled under RCW 4.16.340(1)(c).

---

[2] The marquee in the photograph announces Crystal Gayle and The Commodores and specific August dates for each performer.

[3] The complaint lists additional defendants Washington State United States Bowling Congress, Greater Seattle United States Bowling Congress, Greater Seattle United States Bowling Congress Youth, and Northwest Challenge League f/k/a Puget Sound Travel League.

5

No. 84130-1-I/6

Nonetheless, the trial court granted the summary judgment motion to dismiss[4] because USBC did not owe a duty to R.K.

R.K. appeals.

DISCUSSION

Standard of Review

We review summary judgments de novo. Strauss v. Premera Blue Cross, 194 Wn.2d 296, 300, 449 P.3d 640 (2019). Summary judgment is appropriate when "'there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law.'" Id. (alteration in original) (internal quotation marks omitted) (quoting Rangers Ins. Co. v. Pierce County, 164 Wn.2d 545, 522, 192 P.3d 886 (2008)); CR 56(c). We must construe all facts and inferences in favor of the nonmoving party. Scrivener v. Clark College, 181 Wn.2d 439, 444, 334 P.3d 541 (2014). "A genuine issue of material fact exists when reasonable minds could differ on the facts controlling the outcome of the litigation." Dowler v. Clover Park Sch. Dist. No. 400, 172 Wn.2d 471, 484, 258 P.3d 676 (2011).

Duty

The existence of a legal duty is a question of law reviewed de novo. N.K. v. Corp. of Presiding Bishop of Church of Jesus Christ of Latter-Day Saints, 175 Wn. App. 517, 525, 307 P.3d 730 (2013) (citing Sheikh v. Choe, 156 Wn.2d 441, 448, 128 P.3d 574 (2006)).

Generally, there is no duty to prevent a third party from intentionally harming another unless "'a special relationship exists between the defendant and either the third

---

[4] After the trial court granted USBC's motion, R.K. successfully sought a motion for voluntary nonsuit as to all defendants except USBC.

6

party or the foreseeable victim of the third party's conduct.'" <u>Niece v. Elmview Grp. Home</u>, 131 Wn.2d 39, 43, 929 P.2d 420 (1997) (internal quotation marks omitted) (quoting <u>Hutchins v. 1001 Fourth Ave. Assocs.</u>, 116 Wn.2d 217, 227, 802 P.2d 1360 (1991)). A special relationship, and the accompanying duty to protect arises where (1) the defendant has a special relationship with the tortfeasor that imposes a duty to control that person's conduct or (2) the defendant has a special relationship with the victim that gives the victim a right to protection. <u>H.B.H. v. State</u>, 192 Wn.2d 154, 168-69, 429 P.3d 484 (2018); <u>Niece</u>, 131 Wn.2d at 43 (citing <u>Petersen v. State</u>, 100 Wn.2d 421, 426, 671 P.2d 230 (1983)); <u>N.K.</u>, 175 Wn. App. at 526. When a special relationship exists under § 315, the party owing a duty must use reasonable care to protect the victim from the tortious acts of third parties. RESTATEMENT (SECOND) OF TORTS § 315A cmt. e ("The duty in each case is only one to exercise reasonable care under the circumstances."). <u>H.B.H.</u>, 192 Wn.2d at 169.

A. *Special Relationship with R.K.*

Under Washington case law, entrustment for the protection of a vulnerable victim is the foundation of a special protective relationship. <u>H.B.H.</u>, 192 Wn.2d at 173 (collecting cases). Special tort duties are based on the liable party's assumption of responsibility for the safety of another. <u>R.N. v. Kiwanis Int'l</u>, 19 Wn. App. 2d 389, 406, 496 P.3d 748 (2021). One example of this special relationship is between a school and its students because a student "is placed under the control and protection of the other party, the school, with resulting loss of control to protect himself or herself." <u>N.K.</u>, 175 Wn. App. at 532 (quoting <u>Hutchins</u>, 116 Wn.2d at 228). Another is that between a group home and "highly vulnerable residents" because "a nursing home's function is 'to

7

provide care for those who are unable because of physical or mental impairment to provide care for themselves.'" Niece, 131 Wn.2d at 45 (quoting Shepard v. Meilke, 75 Wn. App. 201, 205, 877 P.2d 220 (1994)). The H.B.H. court rejected the notion that it is only "physical custody" that creates the special relationship and explained that the basis of the special relationship is the "liable party's assumption of responsibility for the safety of another." H.B.H., 192 Wn.2d at 173 (holding that the State, through DSHS, has a special relationship with foster children even while they are in the care of a foster family because DSHS remains the child's legal custodian throughout the duration of the dependency.).

The duty is, however, limited by foreseeability. N.K., 175 Wn. App. at 530. It is not necessary to show that the defendant knew of the particularized risk of criminal conduct, but that a reasonable person in the defendant's position would be aware of the general field of danger posing the risk to someone in the position of the plaintiff. Id.; N.L. v. Bethel Sch. Dist., 186 Wn.2d 422, 431, 378 P.3d 162 (2016).

R.K. compares his case to N.K., stating that "[s]imilarly, here, YABA had a special relationship with the youth participants entrusted to its officers' care during YABA events." In N.K. the victim brought a claim of negligence against the Boy Scouts of America, a national organization, the local boy scouting council, and his church, which hosted his Boy Scout troop, based on each defendant's failure to protect him from sexual abuse by a troop volunteer in 1977. 175 Wn. App. at 522. The court found that the church did have a special relationship with N.K. akin to that between a school and students because it selected the scout masters and volunteers, actively participated in encouraging children to participate in scouting, paid for the boys' participation in the

8

troop, and owned and controlled the facilities where the troop met. Id. at 533. The court, however, declined to find that there was a special relationship between the victim and the national Boy Scouts of America or the local scouting council despite the fact that both organizations provided training and education on operations and were involved in selecting volunteers. Id. at 534. The national organization and the local scouting council did not have a custodial responsibility for the troop members. Id. This court noted that without a relationship "typically involving on-the-ground control of day-to-day operations, an institutional defendant is not in a position to provide protection from physical danger as a school or church group does for children, or to monitor personal care as a hospital or nursing home does for disabled patients." Id. at 535.

YABA's relationship in the instant case is closer to that of the Boy Scouts of America and the local council in N.K. than that of the church. YABA was not involved in the day-to-day operations of WS-YABA, which ran the jamboree. YABA took no role in selecting or screening volunteers and played no part in placing youth with any bowling coaches. Nothing in the record shows that YABA directed or even knew that Treddenbarger took R.K. to Las Vegas in 1997, let alone that they shared a hotel room there.

R.K. argues that when N.K. was decided, that court observed that "NK does not cite authority, and we have found none, that has allowed a case to proceed on the theory of a protective relationship in the absence of a custodial relationship between the organization and the victim." Id. at 535. R.K. cites a non-binding case out of California that expressly disagrees with N.K. Jane Doe v. U.S. Youth Soccer Ass'n, Inc., 8 Cal. App. 5th 1118, 1122, 214 Cal. Rptr. 3d 552 (2017). The Doe court read N.K. to require

9

physical custody in order to establish a special relationship with the plaintiff.  Id. at 1130.

Aside from the fact that H.B.H. clarified that physical custody is not always required,

Doe is factually distinguishable.

In Doe, a local soccer league coach sexually abused a 12-year-old soccer player

in 2011 for about a year.  Doe, 8 Cal. App. 5th at 1123.  The coach later pleaded no

contest to continuous sexual abuse of a child and lewd lascivious acts on a child under

age 14.  Id.  The child later sued the league as well as the state soccer association and

the national soccer association.  Id.  The court reversed the dismissal of all the soccer

organization defendants and held that each had a special relationship with the victim

that created a duty to protect her from the criminal conduct by a third party.  Id. at 1122.

The court observed that United States Youth Soccer Association, Inc. (US Youth), the

national soccer association, acknowledged in 1994 that pedophiles were drawn to its

youth soccer program to gain access to children.  Id. at 1123.  It had developed a

KidSafe Program designed to educate adult volunteers, coaches, employees, parents,

and players participating in its soccer programs regarding the prevention and detection

of sexual abuse.  In the mid-1990's, US Youth distributed the KidSafe Program

pamphlets to each state association, including California Youth Soccer Association,

Inc., but neither the national or state association required the local West Valley Youth

Soccer League coaches, volunteers, trainers and administrators receive information on

or be trained in the KidSafe Program.  Id. at 1124.  No meetings were conducted for

parents and online links to the program were not emailed to parents of children

participating in US Youth programs.  US Youth bylaws also required its state

associations and affiliate leagues collect and screen criminal conviction information on

10

its coaches, trainers, volunteers and administrators who will be in contact with child members. But US Youth permitted its state associations and leagues to collect this information through a "voluntary disclosure" form. The tortfeasor coach had been previously convicted in 2007 of battery against his spouse, but lied on the criminal history form. Neither the league or the state association conducted a criminal background check on that coach. Id. at 1129. Notably, the court reasoned that US Youth established the standards under which coaches were hired, and determined which coaches had custody and supervision of children involved in its program. Id. at 1131.

Unlike US Youth, YABA did not hire coaches and did not determine which coaches had custody or supervised children involved in WS-YABA events, even when they were YABA-certified. We conclude that nothing in the record supports a reasonable inference that YABA assumed responsibility for the safety of R.K.

*B. Special Relationship with Treddenbarger*

R.K. next argues that YABA had a special relationship with Treddenbarger that created a duty to protect R.K. from his conduct.

To create a duty under this theory, there must be the ability for the defendant to control the conduct of the third party and proof that the defendant was aware of the perpetrator's dangerous propensities. N.K., 175 Wn. App. at 535. R.K, as an example of ability to control conduct, points to the fact that YABA required WS-YABA to adopt a mandatory constitution that required any disciplinary recommendation of its officers to be made to YABA for the final decision. However, the ability to discipline after the fact does not eliminate the requirement that the defendant needs to be aware of the

11

perpetrator's dangerous propensities before having a duty to act.

The record shows that neither USBC, YABA or WS-YABA was aware of Treddenbarger's dangerous propensity. USBC received no complaints about Treddenbarger until it was informed of his arrest in March 2017. USBC also has no knowledge of any complaints about Treddenbarger made to either YABA or WS-YABA. Neither R.K. nor his parents reported the abuse to either YABA or WS-YABA. R.K.'s parents did not take legal action or report the abuse to authorities because R.K. did not want to at the time he disclosed the abuse to them in 2000.

R.K. argues that it was common knowledge that Treddenbarger shared a hotel room with R.K. at the national conference in Atlanta in 1998. However, R.K. was 18 at that time. Though Treddenbarger abused other youth bowlers, those instances occurred chronologically after the abuse of R.K. Thus, any information related to Treddenbarger sharing rooms with these other bowlers is information that would not have yet existed during the time Treddenbarger abused R.K. R.K. also points to the fact that he recalled picking up a YABA representative with Treddenbarger and driving her to the Ellensburg jamboree, which R.K. remembered attending when he was under 18. However, there is no evidence that the representative knew that R.K. and Treddenbarger shared a hotel room at the tournament. Suggesting that knowledge of carpooling is enough to raise a reasonable inference of a shared hotel room is too attenuated.

R.K. relies on Brown v. USA Taekwondo, 40 Cal. App. 5th 1077, 1083, 253 Cal. Rptr. 3d 708 (2019), aff'd, 11 Cal. 5th 204, 483 P.3d 159, 276 Cal. Rptr. 3d 434 (2021). In Brown, three plaintiffs sued, among others, the national taekwondo association, US

Taekwondo (USAT), and the United States Olympic Committee. Their claims arose out of their coach's sexual abuse when they were 15 and 16 years old that eventually resulted in felony convictions. Id. at 1082. USAT had a code of ethics prohibiting sexual relationships between coaches and athletes regardless of the athlete's age. Id. at 1085. Plaintiffs alleged that the coach openly carried on relationships with each one of them and USAT knew or should have known the coach was violating the ethics code. Id. at 1086. When the Olympic Committee had actual knowledge of plaintiffs' allegations against the coach, they recommended, following an ethics hearing, terminating the coach's USAT membership. Id. at 1087. But USAT allegedly refused to present the recommendation to the full board of directors and allowed the coach to continue coaching at USAT competitions before putting him on its banned coaches list about two years later. Id.

The court reversed dismissal of USAT as a defendant, holding that it had a special relationship with the tortfeasor coach. The coach was required to register with USAT in order to coach at USAT-sponsored competitions, and athletes could only compete in competitions with registered coaches. Id. at 1083. Notably, the court held that the other defendant, the United States Olympic Committee, did not have a special relationship with the coach. Id. at 1101. It reasoned that although the Olympic Committee "had the ability to control USAT, including requiring it to adopt policies to protect youth athletes, it did not have direct control over the conduct of coaches." Id. at 1083.

In addition to the fact Brown only provides persuasive authority, it is factually distinguishable. Unlike USAT, YABA did not have knowledge of a perpetrator's

dangerous propensities. Treddenbarger was not required to register as a coach and R.K. was not required to have a coach, let alone one associated with YABA.

We conclude that because neither USBC nor YABA was aware of Treddenbarger's dangerous propensity, R.K. cannot show the existence of a special relationship between USBC and Treddenbarger.

### Vicarious Liability

R.K. contends that YABA as the parent company of subsidiary WS-YABA was vicariously liable for the harm R.K. suffered at the hands of Treddenbarger, therefore USBC assumed that liability when it was created and assumed YABA's liabilities. Vicarious liability is a different theory from duty arising from a special relationship. N.K., 175 Wn. App. at 537 (citing Niece, 131 Wn.2d at 48).

USBC contends R.K. abandoned this theory of liability at the summary judgment hearing below. USBC further argues, for the first time on appeal, that the corporate survival statute time bars R.K.'s claims against USBC.

R.K. initially named WS-YABA as a defendant, but WS-YABA was administratively dissolved by the Washington Secretary of State on February 1, 2010 because it failed to file an annual list of officers. The Washington corporate survival statute, RCW 23B.14.340, allows lawsuits against dissolved corporations to be filed for three years after the date of dissolution. USBC now argues that this time bar extends to parent companies even if the parent company assumed the liabilities of the subsidiary at the relevant time period and continues to exist. USBC waived this argument by not raising it below. RAP 2.5(a); Roberson v. Perez, 156 Wn.2d 33, 39, 123 P.3d 844 (2005).

14

No. 84130-1-I/15

We next turn to whether R.K. abandoned its vicarious liability theory below. A party is permitted to withdraw an issue from the trial court's consideration through its attorney. Stratton v. U.S. Bulk Carriers, 3 Wn. App. 790, 794, 478 P.2d 253 (1970). This court generally does not consider issues not raised before the trial court. RAP 2.5(a). The purpose of this rule is to allow the trial court to correct any error called to its attention, avoiding unnecessary appeals and retrials, encouraging the efficient use of judicial resources. Postema v. Postema Enterprises, Inc., 118 Wn. App. 185, 193, 72 P.3d 1122 (2003); State v. O'Hara, 167 Wn.2d 91, 98, 217 P.3d 756 (2009).

R.K. filed an opposition to the summary judgment motion that included argument that Treddenbarger was an agent of YABA and that a principal is subject to vicarious liability to a third party. During oral argument at the motion hearing, the court interrupted USBC at the point when it started to address R.K.'s vicarious liability theory.

> [USBC:] And then with respect to the idea that Treddenbarger was YABA's agent, again, the Court doesn't need to determine whether or not Treddenbarger was YABA's agent. I would submit that there is not sufficient evidence in the record to even establish that. But even if there was, it's blackletter law in Washington that an agent does not act within the scope of an agency in relationship when he commits torts for his own sexual gratification.
> And there's a host of cases that support that, including Thompson v. Everett Clinic, C.J.C. v. Corporation of Bishops of Yakima, Niece v. Elmview.
> It's pretty well established, Your Honor, that even if Treddenbarger had been YABA's agent, that YABA wouldn't be vicariously liable for Treddenbarger's tort. And then (inaudible) –
>
> THE COURT: Why don't I – why don't I stop you there, because I think I'll leave a little bit of time for rebuttal.

The court then asked to hear from R.K.'s counsel and specifically asked counsel to address the different duties that may flow from the relationship with either the victim or with the tortfeasor as discussed in N.K., 175 Wn. App. at 517.

15

Counsel for R.K. began to address the special relationship question and then took a moment to make a clarification.

> I do want to, just for the record, mention that this whole discussion of, you know, intentional (inaudible) committed for sexual personal gratification really have no place in this analysis. That's a vicarious liability argument. That's not the theory that we're proceeding under. I just want to be clear on the record before getting into more detail with the N.K. case.

Counsel went on to address the question of duty and special relationships, but did not return to the issue of vicarious liability. USBC also never returned to its vicarious liability argument in rebuttal and the court never addressed the issue of vicarious liability in its oral or written ruling.

It appears that both USBC and the court understandably may have interpreted R.K.'s counsel's statement to suggest that R.K. was no long proceeding under any vicarious liability theory. In its opening brief, R.K. argues that "[a]ny reasonable observer would assume that Treddenbarger and WSYABA operated as agents of YABA." In reply to USBC's argument of abandonment, R.K. denied abandoning its vicarious liability theory and argued that it is USBC who fails to recognize R.K.'s distinguishing its argument that YABA had an agency relationship with WS-YABA, as opposed to Treddenbarger.

Regardless, we need not determine if R.K. abandoned this theory, because it still does not support reversal of summary judgment.

R.K. focuses his argument on whether WS-YABA is an agent of YABA and could bind YABA through actual or apparent authority. However, such an agency relationship, even if it did exist, is not relevant unless R.K. shows that WS-YABA was vicariously liable for Treddenbarger's conduct. "Vicarious liability, otherwise known as the doctrine

16

of respondeat superior, imposes liability on an employer for the torts of an employee who is acting on the employer's behalf." Niece, 131 Wn.2d at 48. However, "[w]here the employee steps aside from the employer's purposes in order to pursue a personal objective of the employee, the employer is not vicariously liable." Id. (citing Kuehn v. White, 24 Wn. App. 274, 277, 600 P.2d 679 (1979)). Under Washington law, neither YABA nor WS-YABA would be held vicariously liable because an employer is not strictly liable for an employee's intentional sexual misconduct. See S.H.C. v. Lu, 113 Wn. App. 511, 529, 54 P.3d 174 (2002) (citing C.J.C v. Corporation of Catholic Bishop of Yakima, 138 Wn.2d 599, 727-28, 985 P.2d 262 (1999)); Thompson v. Everett Clinic, 71 Wn. App. 548, 860 P.2d 1054 (1993).

R.K. does not address the case law rejecting the finding of vicarious liability for an employee's intentional sexual misconduct and also does not present any argument as to how WS-YABA is vicariously liable for Treddenbarger's conduct. R.K. has not shown how vicarious liability applies in this case.

CONCLUSION

Because we hold, under these facts, that USBC did not have a duty to protect R.K., we need not address whether the statute of limitations properly tolled under RCW 4.16.340(1)(c). The order granting USBC summary judgment is affirmed.

_Coburn, J._

WE CONCUR:

_Chung, J._                              _Mann, J._